UNITED STATES of America,
Plaintiff-Appellee,

v.

Clemmons J. ALLEN, Defendant-Appellant.

No. 93–1525.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1993.

Decided Oct. 27, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 23, 1993.

Michael A. Thill, Asst. U.S. Atty., Office of the U.S. Atty., Dyer, IN (argued), for plaintiff-appellee.

Michael B. Nash, Chicago, IL (argued), Frederick T. Work, Gary, IN, for defendant-appellant.

Before COFFEY and MANION, Circuit Judges, and ALDISERT, Senior Circuit Judge.*

MANION, Circuit Judge.

Clemmons J. Allen appeals his conviction for conducting or aiding and abetting the conduct of an illegal gambling business in violation of 18 U.S.C. §§ 1955 and 2. We affirm.

## I.

From August 1989 until August 1990, the FBI operated a gambling business in Gary, Indiana. (We will refer to this business as "the club.") The FBI's purpose in operating the club apparently was to ferret out corruption among local officials. Special Agent Denise Minor, acting undercover, ran the club along with Bobby Joiner, an FBI informant. Minor and Joiner employed several other people to perform the tasks common to a gambling business, such as running the

* Hon. Ruggero J. Aldisert, Senior Circuit Judge of the U.S. Court of Appeals for the Third Circuit, is sitting by designation.

games and bartending. But since gambling businesses are illegal in Indiana, Minor and Joiner also had several people on the payroll to perform another type of essential work—protecting the business from raids by the local police.

The government alleged that Allen was one of the people providing protection to the gambling business. Allen was a civilian internal affairs investigator for the Lake County Sheriff's Department. He was also a deputy sheriff. Before starting his job with the Sheriff's Department, Allen had been a Gary police officer for twenty years. Allen was also a player in Lake County politics. He was not only associated with several Lake County officials (including the Lake County Sheriff), but was also a Gary city councilman for a number of years. Allen, with his connections in the police and sheriff's departments and to local politicians, would seem like an ideal person to talk to if one was seeking protection from law enforcement officials.

The main evidence against Allen consisted of evidence of conversations Allen had with Joiner and Minor, presented both in video and audio tapes and by live witnesses. On April 14, 1990, Allen met Joiner, Minor, and Willie Anderson (a Lake County Sheriff's police officer who admitted to providing protection) at the club. During the meeting, Allen and Minor discussed holding a fundraising party for Sheriff Stiglich's reelection campaign. Allen and Joiner then discussed old times. Joiner told Allen, "We go way back, you know, you look out for me and I look out for you." Joiner then paid Allen $500 for tickets for Stiglich's fundraiser. Allen responded to Joiner by saying that "Bob, you know, we go way back, you know." To this, Joiner replied, "Yes, man, you know, you know how things are today, you know, so we got to look out for each other."[1]

Allen met again with Joiner at the club ten days later. Allen and Joiner discussed Sheriff Stiglich's fundraiser, which had been a success, and a similar fundraiser to be held for Allen himself. Joiner had purchased some tickets to the Allen fundraiser but gave them back to Allen for a group of senior citizens to use. The conversation then turned to Joiner's relations with Sheriff Stiglich and the Sheriff's Department, and protection:

Joiner: I don't need to tell [Stiglich] to protect me from gamblin'.

Allen: Yeah.

Joiner: I tell ya I told ... I don't need to tell him nothin', he's doin' it. I ain't got no trouble with his people.

Allen: I hear ya.

Joiner: I don't need to say nothin' to him about what I need.

Allen: Yeah.

Joiner: I says Clem and Anderson do everything I need, so hey, ain't no problem.

Allen: Yeah.

Joiner: I got no problem. Whatever you need, you tell me, you got it. I mean, you know, like I said the price ... here man, I'll tell you what to do. You get ... what's that? That's five more.

Allen: Yeah, that's five more.

Joiner: Yeah, just put it, put it on the table you know. We'll take care of you.

Allen: That's three hundred.

Joiner: So it's like ...

Allen: Damn. Well, if you called me at three o'clock in the morning, I'm gonna be there.

Joiner: I know it. That's what ...

Allen: I swear to God, I'm gonna be there.

During the meeting, Joiner gave Allen $300 for fundraiser tickets. Joiner, at Allen's request, also told Allen that he could have some Martell whiskey at Joiner's cost—which was little or nothing, because Joiner's whiskey was supplied by "boosters" (that is, thieves). Three days later, Allen and another man went to the club to pick up the whiskey.

On June 29, Allen went to the club and discussed with Minor a golf outing to be held

---

1. For some reason, the April 14 conversation was not video or audiotaped. The other conversations were taped.

for Judge Graddick. A man named Rock Gant previously had dropped off some tickets for the outing at the club, and Allen talked to Minor about arrangements for collecting the money after the tickets were sold. The conversation went on:

Allen: So I talked to Will a couple days ago. I'll bring either Will or the Judge up here one evenin', I'll call you and make sure Bobby [Joiner's] gonna be here.

Minor: Okay.

Allen: And get an understanding.

Minor: Okay. That's what (unintelligible).

Allen: If the guy wants somethin from Bobby, Bobby is, uh ... no need to spend his money to help somebody that maybe he can't get a favor from later on.

Minor: Right.

Allen: So don't even make good business sense....

Allen: 'Cause I want Bobby to feel comfortable, you know, and ... I mean if he buys a ticket from somebody and does somebody a favor, he needs to feel comfortable that, uh, he's made ... not only has he helped the person, and, and, ni ... nine times outta ten as independent as Bobby is, Bobby put himself in a position where he really don't need no favors from nobody.

Minor: Right.

Allen: But if the time ever comes ...

Minor: Um hum.

Allen: ... You don't want a guy to have amnesia, you know, you don't wanna have to ...

Minor: Right, yeah.

Allen: ... go damn man, you know, uh, two years ago I, I, I did you a hell of a favor, you know.

Minor: Right.

Allen: What the hell's goin' on, you know.

Minor: Right, right.

Allen: Yeah.

Minor: Yeah.

Allen: A ... and, and we are quick to forget things. We're very quick to forget ...

Minor: Um hum.

Allen: ... when people are nice to us, okay.

Minor also told Allen that she and Joiner appreciated what Allen was doing for them. Allen responded by saying, "Okay."

About three weeks later, Allen stopped by the club to pick up a photograph of himself and Sheriff Stiglich that Minor had had enlarged and framed for him. A week after that, Minor called Allen to speak to him about the tickets for the Graddick fundraiser that Gant had dropped off at the club. Allen told Minor to tell Gant that he would make sure Graddick received the ticket money. Allen also asked if Gant was one of the club's "regular customers." Minor replied that "No, he, uh, you know, gambles every now and then, but, you know, he doesn't come regularly." On July 30, Minor paid Allen $150 for the Graddick tickets.

A grand jury charged Allen in a two-count indictment. Count 1 alleged that Allen committed a RICO violation by conducting the affairs of the Lake County Sheriff's Department through a pattern of racketeering activity. See 18 U.S.C. § 1962(c). Count 1 charged six racketeering acts. The first five acts were alleged violations of the Indiana bribery statute, Ind.Code 35–44–1–1(a)(2). Those acts were: accepting $500 from Joiner and Minor on April 14, 1990 (the money he received for the Graddick fundraiser tickets); accepting $300 from Joiner and Minor on April 24, 1990 (the money he received for his own fundraiser tickets); accepting the case of Martell whiskey on April 27; accepting the framed photograph of himself and Sheriff Stiglich on July 20; and accepting $150 on July 30 (the money he received for the Graddick fundraiser tickets). The sixth racketeering act alleged that from August 1989 through August 1990, Allen conducted or aided and abetted the conduct of an illegal gambling business. The indictment restated the allegations of racketeering act six as a separate count in Count 2.

The government's theory at trial was that Allen had accepted bribes from Joiner and Minor in exchange for protecting the club's gambling operations from police intervention; his protection constituted the conduct neces-

sary to convict Allen of conducting or aiding and abetting the conduct of the gambling business. Allen maintained that the money and other items he received were legitimate campaign contributions, and that he never promised to provide protection to the club. The jury found Allen guilty on count 2, the gambling count. But oddly enough, in answering a special interrogatory, the jury found that the only racketeering act Allen had committed was accepting a bribe by accepting the Martell whiskey from Joiner (despite the fact that racketeering act 6 was the aiding and abetting of an illegal gambling business charged in count 2). Because it found that Allen had committed only one racketeering act, the jury acquitted Allen on the RICO charge. After the district court denied his post-trial motions and sentenced him, Allen filed this appeal.

## II.

Allen asserts that he sought and accepted campaign contributions, not bribes. The government asserts that the payments to Allen were not campaign contributions but outright bribes, and that even if the payments were campaign contributions, they were still bribes. Assuming that the payments were actually campaign contributions (a reasonable assumption given that every payment was made in the context of a political campaign, that three of the payments were at least ostensibly in exchange for tickets to fundraising functions, and that even the case of whiskey was actually used at a fundraising function) the question is: when is a campaign contribution a bribe? According to Allen, only if a payment "is made in return for an explicit promise or undertaking by the official to perform or not to perform an official act;" that is, only if the payment is an explicit quid pro quo for the promise. At trial, Allen submitted an instruction that would have told the jury that

> Whatever your attitudes regarding political fundraising and whatever the ethical considerations may be, so long as election campaigns are financed by private contributions, such contributions cannot be considered bribes unless, and only if, accepted in return for an explicit promise or under-

taking to perform or not to perform an official act.

Allen draws this standard from the Supreme Court's decision in *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). In *McCormick,* a state legislator received cash payments during his reelection campaign from a lobbyist supporting a particular piece of legislation; the legislator subsequently sponsored and spoke in favor of the legislation. A grand jury charged the legislator with five counts of violating the Hobbs Act by extorting payments "under color of official right," 18 U.S.C. § 1951(b)(2), and a jury convicted him. —— U.S. at ——, 111 S.Ct. at 1810. But the Supreme Court reversed the legislator's conviction because the trial court had not instructed the jury that the receipt of campaign contributions constitutes extortion under color of official right "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act." *Id.* at ——, 111 S.Ct. at 1816.

The district court refused to give Allen's requested jury instruction based on *McCormick* because *McCormick* involved Hobbs Act extortion, while Allen's case involved an alleged RICO violation based on alleged violations of Indiana's bribery statute. The court reasoned that unlike the Hobbs Act, the Indiana bribery statute required no explicit quid pro quo between a purported campaign contribution and an official act. Instead, " 'in Indiana it is the soliciting or the receiving of money by an official to influence him with respect to his official duties that is the gravamen of the offense of bribery.' " *United States v. Allen,* No. HCR 91–73, at 17–18 (N.D.Ind.1992) (quoting *United States v. Forszt,* 655 F.2d 101, 103 (7th Cir.1981)).

Allen's response to the district court's distinction between bribery and Hobbs Act extortion is essentially, "So what?" Allen maintains that whether the charge against a defendant be extortion or bribery, the concerns that led the Supreme Court to adopt the quid pro quo requirement in *McCormick* exist. This argument is not without force. *McCormick* recognized several realities of the American political system. Money fuels

the American political machine. Campaigns are expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises. It would be naive to suppose that contributors do not expect some benefit—support for favorable legislation, for example—for their contributions. To hold that a politician committed extortion merely by acting for some constituents' benefit shortly before or after receiving campaign contributions from those constituents "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the nation." —— U.S. at ——, 111 S.Ct. at 1816. Only statutory language much more explicit than that in the Hobbs Act would justify a contrary conclusion. *Id.*

■ As the law has evolved, extortion "under color of official right" and bribery are really different sides of the same coin. "Extortion 'under color of official right' equals the knowing receipt of bribes.... [I]t is extortion if the official knows that the bribe ... is motivated by a hope that it will influence him in the exercise of his office and if, knowing this, he accepts the bribe." *United States v. Holzer,* 816 F.2d 304, 311 (7th Cir.), *vacated on other grounds,* 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987); see also *Evans v. United States,* —— U.S. ——, ——, 112 S.Ct. 1881, 1888, 119 L.Ed.2d 57 (1992) ("the wrongful acceptance of a bribe establishes all the inducement the [Hobbs Act] requires" for extortion under color of official right). Because of the realities of the American political system, and the fact that the Hobbs Act's language did not justify making commonly accepted political behavior criminal, the Supreme Court in *McCormick* added to this definition of extortion the requirement that the connection between the payment and the exercise of office—the quid pro quo—be explicit. Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did

in interpreting the Hobbs Act: absent some fairly explicit language otherwise, accepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act. Vague expectations of some future benefit should not be sufficient to make a payment a bribe.

The Indiana bribery statute contains no clear language that would lead one to conclude that it criminalizes normal campaign contributions even if closely followed by official action favorable to the contributor. In fact, the statute specifically excepts property a public servant is authorized by law to accept, and the government does not contend that Indiana law does not authorize the receipt of campaign contributions. But *McCormick* interpreted a federal statute; it created a rule for interpreting federal statutes, not a universal rule of statutory construction. It is the job of Indiana's courts to interpret Indiana's bribery statute, and we are bound by the Indiana courts' construction. So, the question is: would Indiana's courts follow *McCormick* in interpreting Indiana's bribery statute?

None of the Indiana cases the district court cited for its construction of the Indiana bribery statute involved a defendant who claimed to be receiving political campaign contributions. See *Williams v. State,* 188 Ind. 283, 123 N.E. 209 (1919); *Glover v. State,* 109 Ind. 391, 10 N.E. 282 (1887); *Stuckey v. State,* 560 N.E.2d 88 (Ind.App. 1990). Other than a glancing reference to campaign contributions, the same is true of our decision in *United States v. Forszt,* 655 F.2d 101, 103 (7th Cir.1981). This court's decision in *United States v. Mokol,* 957 F.2d 1410 (7th Cir.1992), which the district court also cited, did involve a defendant claiming that alleged bribes were really campaign contributions. But in *Mokol,* the question was whether the payments were bribes or campaign contributions; the *McCormick* issue appears not to have been raised; and, in any event, the evidence of an explicit quid pro quo was clear. See *id.,* at 1414–16.

■ We need not delve any deeper into this question, however, for two reasons.

First, Allen was not convicted of bribery, or of the RICO charge for which bribery supplied the predicate offenses. Allen was convicted only of aiding and abetting the conduct of an illegal gambling business. The government did not have to prove that Allen accepted any bribes to prove this charge, and the jury could have found Allen guilty of that charge without finding that Allen received any bribes. Nothing in the indictment or jury instructions made a gambling conviction dependent on a finding of bribery. Therefore, Allen was not harmed by the district court's refusal to give his proposed *McCormick* instruction.

■ In any event, failure to give a proposed instruction is not reversible error if the instructions as a whole treat the issues presented at trial fairly and adequately. *United States v. Ruiz*, 932 F.2d 1174, 1179 (7th Cir.1991). Although the district court refused to give Allen's proposed *McCormick* instruction, it did give the following instruction:

> The defendant's theory of defense is that money given to him was for tickets to campaign fundraising events ... and that he had a perfect right to accept the money and liquor. *Campaign contributions are not bribes even if the contributor expects to have business before the official in the future. For a campaign contribution to be a bribe, there must be a specific request by the contributor made of the official to act or to refrain from acting as a quid pro quo for the contribution. It is not enough that the contributor is making the contribution to create good will or with the vague expectation of help in the future.*

The italicized portion of this instruction neatly sums up the central idea expressed in *McCormick* about the relationship between campaign contributions and illegal conduct. Allen's proposed *McCormick* instruction would have been redundant, and a district court has no duty to be redundant. Allen, however, complains that the court should have given his proposed instruction because the instruction given was merely a theory of defense instruction. Allen claims he was entitled to an instruction defining the law, which the jury must follow, as opposed to his

theory of defense, which the jury may disregard. But Allen's argument rests on an unrealistically technical reading of the given instruction. Only the first sentence of the instruction, which sets out the factual premise of Allen's defense, is specifically prefaced as a "theory of defense." The rest of the instruction sets out the legal principles on which Allen's theory is based and are not prefaced by a statement that they are "theory." Rather, those principles are set forth no differently than any other legal principles set forth in the other instructions. It is unrealistic to suppose that a typical juror would consider those legal principles as something other than the law which the juror must follow. In fact, Allen's lawyer argued the quid pro quo issue in closing argument as if the court was instructing that *McCormick* was the law. For the most part, the jury seemed to agree with Allen's lawyer by rejecting four of the five bribery allegations in the racketeering charge. Thus, there was no need for the district court to give Allen's proposed *McCormick* instruction.

### III.

Allen contends that the evidence was insufficient to convict him of conducting or aiding and abetting the conduct of an illegal gambling business. In line with this argument, we first need to consider several challenges Allen makes to the district court's evidentiary rulings. Allen argues that the district court erred by allowing the government to introduce campaign finance reports for the Stiglich, Graddick, and Allen campaigns. Indiana law requires that all contributions exceeding $100 be itemized and reported, a requirement reflected on the report forms themselves. See Ind.Code § 3–9–5–14(3)(A). Yet, none of the reports showed any itemized contributions from Joiner or Minor. The government introduced the reports to show that since no contributions were reported from Joiner or Minor, despite Indiana law, Allen never turned the money in to the campaigns and the payments were not really campaign contributions.

■ The district court did not abuse its discretion by admitting the reports. The

reports were relevant because one of the issues at trial was whether the payments Allen received from Joiner and Minor really were campaign contributions. The absence of any report of payments from Joiner and Minor, despite Indiana law requiring those contributions to be specifically reported, had at least some tendency to show that it was more likely that the payments really were not campaign contributions. See Fed. R.Evid. 401.

Allen counters that other evidence at trial canceled any claim that the payments were not campaign contributions. The four campaign workers who prepared the reports (witnesses presented by the government) testified that it was their practice not to itemize any cash contributions. Therefore, says Allen, the reports were not really relevant. However, none of this evidence necessarily refutes the contention that the payments could have been bribes merely disguised as campaign contributions. It was for the jury to sort through the conflicting evidence and decide what to believe and the district court did not abuse its discretion by allowing the jury to perform this task.

Allen also argues that the district court erred by admitting the audio and videotaped conversations between him and Joiner on April 24 and 27, and May 30. Allen contends that statements made on the tapes by Joiner are inadmissible hearsay. He also contends that allowing Joiner's taped statements into evidence, without producing Joiner as a witness, violated his Sixth Amendment right to confront the witnesses against him. According to Allen, the district court admitted the tapes, Joiner's statements and all, on the theory that Allen had adopted Joiner's statements as his own. Therefore, Joiner's statements were admissible because admissions by a party-opponent, including adoptive admissions, fall outside the hearsay rule. See Fed.R.Evid. 801(d)(2)(B).

■ Deciding that Allen had adopted Joiner's statements was not an abuse of discretion. True, Allen never said, "I adopt Joiner's statements." But the rules require only "a manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements."

*United States v. Rollins,* 862 F.2d 1282, 1296 (7th Cir.1988); see Fed.R.Evid. 801(d)(2)(B). Allen complains that the only evidence of adoption is his silence in the face of allegedly incriminating statements made by Joiner. That is not so. From the entire context of each conversation (including the non-verbal cues the jury could see in the tapes), along with Allen's failure to contest any incriminating statements, the district court and the jury could find that Allen adopted Joiner's statements.

The April 24 tape provides an example of this. Joiner made several statements about protection from gambling, including the statement, "I says Clem and Anderson do everything I need, so hey, no problem." To this statement Allen replied, "Yeah"; he had replied similarly ("Yeah" or "I hear ya.") to similar statements. Right after that, Joiner gave Allen $300; Allen then stated, "Well, if you called me at three o'clock in the morning, I'm gonna be there.... I swear to God, I'm gonna be there." This colloquy is more than mere adoption by silence. The entire context of the conversation—including Allen's own words—evidence his adoption of Joiner's statements. The other tapes contain similar exchanges.

■ As for Allen's Sixth Amendment argument, we previously have held that lack of opportunity to cross-examine the declarant of a statement the defendant has adopted as his own does not violate the confrontation clause. See *Rollins,* 862 F.2d at 1297; accord *United States v. Lemonakis,* 485 F.2d 941, 949 (D.C.Cir.1973). The reason for this is not difficult to understand. An "adoptive admission" is a statement that the defendant has adopted as his own. Thus the defendant himself is, in effect, the declarant. The "witness" against the defendant is the defendant himself, not the actual declarant; there is no violation of the defendant's right to confront the declarant because the defendant only has the right to confront "the witnesses against him." U.S. Const. Amend. VI; see *Rollins,* 862 F.2d at 1297.

Allen also raises one more evidentiary issue. While being cross-examined about one of her meetings with Allen, Minor testified

that "I assumed ... that he would continue to do favors for us, protecting our gambling spot, because he was anticipating that we could do him a favor." Allen argues that the district court should have struck this testimony because Minor's "assumptions" were irrelevant to whether Allen actually was providing protection to the club.

What Allen is really complaining about is that Minor's "assumption" was of no use to the jury because it was mere mental speculation divorced from any personal perception about whether Allen had been providing or would continue to provide protection. Lay testimony not based on personal knowledge is useless; a witness cannot provide information about a matter the witness does not know about, a fact reflected in Fed.R.Evid. 602's requirement that a witness may not testify to a matter absent personal knowledge. But the fact that Minor cast her testimony as an assumption makes it neither necessarily irrelevant nor inadmissible. Federal Rule of Evidence 701 "permits a lay witness to offer an opinion or inference that is rationally based on the witness' perceptions and that is helpful to the development of evidence at trial." *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir.1990). Minor's assumption can be recast as either an opinion or inference—the label she herself used is not determinative—and is admissible under Rule 701 if it meets that rule's requirements.

The first of those requirements is that Minor's assumption had to have been rationally based on her own perceptions. In other words, did Minor have sufficient personal knowledge to form an inference about whether Allen was providing and would continue to provide protection? Allen argues that he never told Minor he was providing protection. True, Allen never used the word "protection." But Minor had dealt with Allen several times. She knew she and Joiner wanted protection; and she also knew that Allen was receiving favors from her and Joiner and that Allen was concerned that when somebody does a favor, the recipient should not forget that favor.

The basis for Minor's personal knowledge is not overwhelming. But Rule 701 places great reliance on a party's ability to cross-examine an opponent's witness and present any weaknesses in the witness's testimony to the trier of fact. *United States v. Lawson*, 653 F.2d 299, 303 (7th Cir.1981). "The trier of fact can normally be depended upon—with the aid of counsel—to pick up the nonverbal signals which, although absent from the record, indicate fairly clearly when the witness is describing what he saw and when he is describing what he thinks happened; the trier of fact also should generally be depended upon to give whatever weight or credibility to the witness' opinion as may be due." 2 Jack B. Weinstein and Margaret Berger, *Weinstein's Evidence* ¶ 701[02], at 701–32 (1993).

Rule 701's second requirement is that the testimony be helpful to the jury's understanding of the issues at trial. At trial, Allen's attorney objected that Minor's "assumption" about Allen providing protection "is what this case is all about anyway." This sounds like an objection based on the fact that Minor was offering an opinion on an "ultimate issue." But under the federal rules, that is no longer a valid objection. Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

But despite the abolition of the ultimate issue rule, the relationship of the opinion to the issues in the case is important to determine helpfulness. "The closer the subject of the opinion gets to critical issues the likelier the judge is to require the witness to be more concrete ... because the jury is not sufficiently helped in resolving disputes by testimony which merely tells it what result to reach." 2 *Weinstein's Evidence* ¶ 701[02], at 701–25; see also David W. Louisell and Christopher B. Mueller, *Federal Evidence*, § 376, at 622–23 (1979). "[M]eaningless assertions which amount to little more than choosing up sides," such as statements that a defendant is "guilty", are properly excluded by the helpfulness requirement. Fed. R.Evid. 701, Advisory Committee Note; see

also Louisell and Mueller, *supra*, § 376, at 620.

But ultimately, the question of whether a lay opinion falls into the category of "meaningless assertion" or whether that opinion actually will help the jury decide an issue in the case is a judgment call for the district court. Minor's testimony was relevant, and Allen's lawyer had ample opportunity to clarify (and pick apart) her testimony on cross-examination. In any event, nothing in Allen's trial objection specifically referenced the court to Rule 701's helpfulness requirement. In these circumstances, we find no abuse of discretion in the district court's failure to strike Minor's assumption about Allen's providing protection at the club.

■ This brings us to Allen's contention that the evidence was not sufficient to convict him of conducting or aiding and abetting the conduct of the gambling business. We agree that the evidence of Allen's actually conducting a gambling business is thin, perhaps too thin. But the evidence of Allen's conversations with Joiner and Minor provide sufficient, if not overwhelming, evidence to sustain a conviction for aiding and abetting.

This circuit has adopted the standard for aiding and abetting formulated by Learned Hand over fifty years ago in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938). That standard requires that to be an aider and abetter, a person " 'in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, that he seek by his action to make it succeed.' " *Giovannetti*, 919 F.2d at 1227; *United States v. Pino–Perez*, 870 F.2d 1230, 1235 (7th Cir.1989) (en banc). Knowingly providing protection (or promising to provide protection) for a gambling business is the type of behavior that would meet the standard for aiding and abetting that business.

■ The standard for aiding and abetting first requires evidence that the defendant knew about the venture he was aiding; a person cannot very well aid a venture he does not know about. Here, there was evidence from which the jury could reasonably conclude that Allen knew that the club was an illegal gambling business. For example,

when Allen asked Minor if Rock Gant was a "regular customer," Minor responded that he "gambles every now and then" but did not come regularly. More tellingly, the jury could conclude from the tape of the April 24 conversation between Allen and Joiner that the two openly discussed protecting the gambling business.

The jury could also reasonably decide that Allen was receiving favors from Minor and Joiner—the various payments they made to him. Allen argues that because the jury found four of the five payments alleged in the indictment were not bribes, we may not consider those payment as evidence that Allen provided protection to the club. But as we noted earlier, neither the indictment nor the jury instructions made a guilty finding on the gambling charge depend on whether the payments described in the RICO count were bribes. Even if those payments cannot technically be characterized as bribes, the evidence of those payments is still relevant to show Allen's motivation to provide protection.

This evidence that Allen was receiving favors from what he knew to be a gambling business buttresses the reasonable inferences from the recorded conversation that Allen actually had promised to provide protection to the club. For example, the tapes provided evidence of Allen's general attitude toward favors: when a person does a favor for somebody, "you don't want [him] to have amnesia.... We're very quick to forget things...." But the tapes also provided more direct evidence. After not disputing Joiner's statement that "Clem and Anderson do everything I need" (i.e., provide protection), Allen accepted a payment from Joiner and told him "if you called me at three o'clock in the morning, I'm gonna be there."

From this evidence, the jury could reasonably find that Allen had a stake in the club's continued operation because the club's owners were doing him favors. The jury could also find he did something to help the club succeed: he promised to provide protection. From this, the jury could find that Allen associated himself with the club, that he participated in it as something he wished to bring about, that he sought by his action to

make it succeed, and, therefore, that he aided and abetted the club's operation, and was guilty on count 2 of the indictment.

## IV.

Allen raises two other issues, neither of which require extended discussion. The district court instructed the jury that it could find Allen acted knowingly if it found that he "had a strong suspicion that things were not what they seemed or that someone withheld some important facts, yet shut his eyes for fear of what he would learn . . . ." Allen argues that the court erred by giving this "ostrich"—or, more properly speaking, "conscious avoidance"—instruction because there was no evidence that Allen consciously avoided knowledge of the fact that the club was really an illegal gambling business.

 Allen, however, failed to object to the ostrich instruction at trial. Therefore, our review is limited to determining whether the district court committed plain error by giving the instruction. See Fed.R.Crim.P. 30 and 52(b). A plain error is an obvious error "so grievous that it caused an actual miscarriage of justice, which implies that the defendant probably would not have been convicted absent the error." *United States v. McKinney,* 954 F.2d 471, 475–76, 478 (7th Cir.1992). The district court committed no plain error here. First, it is not obvious that the ostrich instruction was inappropriate in this case. Allen's knowledge of what was going on at the club was at issue. Allen testified that he had no idea gambling was going on at the club, yet there are indications in the record from which one might conclude that Allen would at least suspect that gambling was going on there. Second, Allen has not made any convincing argument that the jury's verdict probably would have been different had the district court not given the ostrich instruction. The primary evidence against Allen was his own words, captured (for the most part) on videotape; the ostrich instruction was not likely to deflect whatever force the jury chose to give those words.

 Allen also argues that the prosecutor committed reversible misconduct by arguing that the fundraising tickets Allen was selling were "[n]othing more than the currency for corruption." Allowing improper prosecutorial argument is reversible error only if that argument deprived the defendant of a fair trial. See *United States v. Ferguson,* 935 F.2d 1518, 1530 (7th Cir.1991); *United States v. Spivey,* 859 F.2d 461, 465 (7th Cir. 1988). Allen's argument about the prosecutor's comments fails this test in two ways. First, in context, the argument was not improper. The prosecutor was not arguing, as Allen insists, that political fundraising in general is improper. He was arguing instead that the tickets Allen was selling were merely a cover for the receipt of bribes. Although the jury seems not to have bought this argument, the argument was fair comment on the evidence. In any event, even if the comment was improper, Allen has not shown that this isolated comment was likely to have had a substantial enough impact on the jury to deprive him of a fair trial.

For the above reasons, we affirm the district court's judgment.

AFFIRMED.