James A. WURSTER, Samuel R. Turpin, Willis R. Conner, Appellants–Defendants,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–9802–CR–126.

Court of Appeals of Indiana.

March 29, 1999.

Robert W. Geddes, Edward F. Harney, Jr., Hume Smith Geddes Green & Simmons, Robert W. Hammerle, Joseph M. Cleary, Hammerle Foster Allen & Long–sharp, John C. Stark, Thomas A. Brodnik, Richard B. Kaufman, Stark Doninger & Smith, Duge Butler, Jr., Butler Hahn Hill & Schembs, Indianapolis, Indiana, Attorneys for Appellants.

Scott C. Newman, Marion County Prosecuting Attorney, Lawrence J. Brodeur, Mar-

ion County Prosecutor's Office, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

RILEY, Judge
### STATEMENT OF THE CASE

Defendants–Appellants Samuel Turpin ("Turpin"), James Wurster ("Wurster") and Willis Conner ("Conner") appeal from the trial court's denial of their motions to dismiss the grand jury indictment charging each of the three defendants with bribery, Wurster and Conner with unlawful lobbying, and Turpin with five counts of filing a fraudulent report and one count of perjury.

We affirm in part and reverse in part.

### ISSUES

The following consolidated issues are presented for our review:

1. Whether the trial court erred in denying motions to dismiss the indictment due to the allegedly defective grand jury proceedings.

2. Whether the trial court erred in denying motions to dismiss Count I of the indictment charging Turpin with bribery and Count II of the indictment charging Wurster and Conner with bribery.

3. Whether the trial court erred in denying Wurster's motion to dismiss Count III of the indictment charging him with unlawful lobbying.

4. Whether the trial court erred in denying Turpin's motion to dismiss Counts VI through X of the indictment charging him with filing a fraudulent report.

5. Whether the trial court erred in denying Turpin's motion to dismiss Count XI of the indictment charging him with perjury.

### STATEMENT OF THE FACTS

In 1984, Turpin was elected to the Indiana House of Representatives, where he served in various capacities until the end of 1996.[1] He did not run for re-election during 1996.

American Consulting Engineers, Inc. ("ACE") is a large engineering firm located in Indianapolis. ACE engages in a wide variety of engineering services, with a significant amount of its business being contracted with governmental entities. During the relevant time periods, Wurster was the CEO and part-owner of ACE. Conner was the President and part-owner of ACE.

In June of 1993, Turpin, doing business as Turpin & Associates, entered into a contract with ACE, whereby Turpin would serve as an independent marketing consultant for ACE, marketing ACE to local governmental entities and the private sector. Under the terms of the contract, ACE would pay Turpin & Associates a monthly sum of $1,500.00. By its terms, the contract specifically excluded marketing ACE's services for state government projects. The contract was terminated by agreement of the parties in May of 1996. During the life of the contract, Turpin & Associates received fees from ACE in the approximate sum of $52,500.00.

In an unrelated transaction, ACE sent a $10,000.00 check to the Indiana Motor Truck Association ("IMTA") in December of 1995. During this same time period, approximately fifteen Indiana engineering firms made contributions to the IMTA to aid the Association's efforts in helping overcome the State's shortfall of available highway construction dollars. Later in December of 1995, ACE sent an additional check to IMTA in the amount of $1,250.00.

In 1996, the Marion County Grand Jury began investigating Turpin and the other defendants. The investigation was sparked by a series of stories in *The Indianapolis Star* and *The Indianapolis News*. It was reported in these stories that Turpin accepted more than $50,000.00 from ACE, while effectively hiding the employment relationship. It was further reported in these news stories that Turpin took official action that benefitted ACE during the time he was accepting payments from ACE. At the direction of then House Speaker Paul Mann-

---

**1.** In 1995, when the Republicans gained numeric control of the Indiana House of Representatives, Turpin became chairman of the House Ways and Means Committee. At this time, Turpin had served since 1991 as the ranking minority member of the House Ways and Means Committee.

weiler, the Legislative Ethics Committee began an investigation of Turpin. In June of 1996, Turpin resigned as the chairman of the House Ways and Means Committee, and informed the full House that he would not seek re-election after serving out his term. In April of 1997, Turpin's residence was searched and several boxes of records were seized by the Indianapolis police. In May of 1997, the Marion County Grand Jury returned an eleven count indictment naming Turpin, Wurster, Conner and a fourth individual as defendants. Turpin was charged with bribery, perjury and five counts of filing a fraudulent report. In Count II of the indictment, Wurster and Conner were charged with bribery; and in Count III, Wurster was charged with unlawful lobbying. The charge of unlawful lobbying related to the payments ACE made to IMTA, and ACE's failure to timely file required reports with the Indiana Lobby Registration Commission. Turpin's filing a fraudulent report charges stemmed from campaign finance reports filed by Turpin, and Turpin's perjury charge related to an affidavit he submitted to the Bureau of Motor Vehicles in Hendricks County after purchasing a truck from a neighbor.

In October of 1997, each of the three defendants filed motions to dismiss the indictment in its entirety, and the bribery counts. Also, Turpin moved to dismiss Counts VI through X, charging him with filing a fraudulent report, and Count XI charging him with perjury. Wurster filed a motion to dismiss Count III of the indictment charging him with unlawful lobbying. The State filed its responses to each motion and the court heard oral arguments on the motions to dismiss and other pending motions to sever. In January of 1998, the court denied each of the defendants' motion to dismiss.

Wurster and Conner filed a motion to certify the court's denial of their motions to dismiss Count II of the indictment, and Wurster and Turpin filed separate motions to certify the court's denial of their respective motions to dismiss. The trial court promptly

certified the interlocutory appeal, and we accepted jurisdiction in March of 1998. This permissive interlocutory appeal followed.[2] We heard oral argument on November 17, 1998.

## DISCUSSION AND DECISION

I. *Motion to Dismiss Indictment Defective Grand Jury Proceedings*

The defendants each argued in their respective motions to dismiss that the entire indictment should be dismissed due to the alleged irregularity in which the grand jury proceedings were conducted. Specifically, the defendants take issue with the fact that significant portions of the proceedings were not of record, that the grand jurors were not permitted to ask questions directly to the witnesses and that exculpatory evidence known to the State was not presented to the grand jury.

The court may dismiss an indictment or information, upon motion of the defendant, if the grand jury proceeding is defective. Ind.Code § 35–34–1–4(a)(3). Ind. Code § 35–34–1–7 provides that "[a]n indictment shall be dismissed upon motion when the grand jury proceeding which resulted in the indictment was conducted in violation of IC 35–34–2." The functions of a grand jury are not judicial, they are merely inquisitorial. *Ajabu v. State*, 677 N.E.2d 1035 (Ind.Ct.App. 1997), *trans. denied, (citing Adams v. State*, 214 Ind. 603, 605, 17 N.E.2d 84, 85 (1938)). Grand jury proceedings are not a trial, or even an adversary proceeding. *Ajabu*, 677 N.E.2d at 1039. Rather, the grand jury is an independent body which is charged with investigating the facts to determine "whether probable cause exists that a crime has been committed and whether an indictment (true bill) should be returned against one for such a crime." *Id. (citing* BLACK'S LAW DICTIONARY 855 (6th ed.1990)). Unlike a petit jury, the grand jury does not determine the guilt or innocence of the accused. Rather, the grand jury determines if there is probable cause to believe that the accused has

2. By order of the Chief Judge, the separate appeals of Turpin, Wurster and Conner were consolidated and assigned to this panel.

committed a crime. *Ajabu*, 677 N.E.2d at 1039.

Here, the defendants argue that because the grand jurors were not permitted to question the witnesses on the record, the grand jury was stripped of its investigative role and reduced to a mere "hand puppet of the State." (Turpin's Brief at 28). At the hearing on the defendants' respective motions to dismiss, the State stipulated that the grand jurors did not ask any direct questions to the witnesses. Specifically, the State stated as follows:

I simply set up a procedure whereby witnesses were brought in. I asked questions of the witnesses. When I concluded with my questions, I sent the witnesses—the witness outside the room ·and then discussed with the members of the Grand · Jury if they had any further questions, areas they wanted to go over, or whatever, with this particular witness. If they did, ... then I would bring that witness back in and there are several transcripts that have been turned over to defense in discovery which indicate the witness comes back in for further interrogation and I did ask the questions.

(Turpin Record, 481–82). Our review of the transcripts referred to by the State reveal that several of the witnesses were called back to give additional testimony. Although the questions were ultimately asked by the prosecutor, they represented original questions from the grand jurors.

The prosecuting attorney may be present with the grand jury for the· purpose of giving information and advice upon legal matters, and he may interrogate witnesses. thereby assisting the grand jury in developing evidence. *Turpin v. State*, 206 Ind. 345, 189 N.E. 403, 404 (Ind.1934). Only in cases in which there is such "flagrant imposition of the grand jurors' will or independent judgment" will the court find a violation of due process. *Averhart v. State*, 470 N.E.2d 666, 680 (Ind.1984), *cert. denied.* In *Averhart,* the appellant argued that certain evidence presented to the grand jury was irrelevant and prejudicial, thereby leading to a lack of impartiality on the part of the grand jury.

Finding no reversible error, the supreme court stated that:

[the appellants] do not show that the entire proceedings before the grand jury were so pervaded with bias that there was a lack of a detached and neutral atmosphere within the grand jury. There is neither a showing or claim that anyone besides the prosecuting attorney participated in the proceedings, nor that witnesses were oppressed in any manner.... [T]his claim is not grounds for dismissal of an indictment. A claim of impartiality or bias of a grand jury is neither grounds for disqualification of a jury, grounds for a finding it is illegally constituted, nor grounds for dismissal.

*Id.* at 680. It is without doubt that prosecutors are vested with wide discretion in matters of the grand jury. *See e.g. State v. Fields*, 527 N.E.2d 218, 221 (Ind.Ct.App. 1988). Under the present facts, there has been no showing that the manner in which the grand jury proceedings were carried out infringed upon the sensibility of the grand jury such that it was unable to fulfill its inquisitorial role. *See United States v. Cederquist*, 641 F.2d 1347 (9th Cir.1981) (dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way).

The defendants also argue that the State was aware of significant exculpatory evidence that was not presented to the grand jury. The defendants do not contend that there exists a duty for prosecutors to reveal exculpatory evidence before a grand jury. Rather, they contend that, under the facts of this particular case, it was prejudicial for the State not to present testimony directly contradictory to the testimony of their witnesses before the grand jury.

In *U.S. v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), the United States Supreme Court held that a district court may not dismiss an otherwise valid indictment because the Government failed to disclose to the grand jury "substantial exculpatory evidence" in its possession. 504 U.S. 36, 112 S.Ct. 1735, 1741–46, 118 L.Ed.2d 352. In discussing the wisdom of

this rule, the Court stated that "requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory body that sits to assess whether there is adequate basis for bringing a criminal charge into an adjudicatory body that sits to determine guilt or innocence." The Court went on to say that it has always been thought sufficient for the grand jury to hear only the prosecutor's side, and that the suspect has no right to present and the grand jury has no obligation to consider exculpatory evidence. 504 U.S. 36, 112 S.Ct. at 1744–46. The prosecutor's choice of evidence presented to the grand jury was a matter within his discretion, and we find no basis for dismissal of the indictment on these grounds.

Overall, we cannot say that the conduct of the prosecutor influenced the course of proceedings in a manner adverse to the defendants' substantial right to a detached and neutral atmosphere. Accordingly, we affirm the trial court's denial of the defendants' motion to dismiss the indictment.

## II. Sufficiency of the Indictment
### Bribery Charge

The defendants contend that the trial court erred in denying their motions to dismiss Counts I and II of the indictment charging bribery. Specifically, the defendants argue that the indictment fails to allege the essential elements of the offense of bribery; that the indictment fails to sufficiently apprise them of the offense they are required to defend against; and that the indictment fails to disclose sufficient facts so as to protect the defendants from future prosecutions arising from the same facts. We agree.

Turpin was charged in Count I of the indictment as follows:

From June, 1993 through May, 1996, in Marion County, Indiana, Samuel R. Turpin, being a public servant, that is: an elected member of the House of Representatives, did accept property, that is: money, from American Consulting Engineers, Inc., by and through its agents, James A. Wurster and Willis R. Conner, with the intent that such money would control the performance of acts related to Samuel R. Turpin's employment or function as a public servant, that is: with the intent that Samuel R. Turpin would act to support or promote legislative measures and decisions that would result in economic gain to American Consulting Engineers, Inc.

(Turpin Record, 40).

Wurster and Conner were charged in Count II of the indictment as follows:

From June, 1993 through May, 1996, in Marion County, Indiana, James A. Wurster and Willis R. Conner, officers of American Consulting Engineers, Inc., did confer property, that is: money, on a public servant, that is: Samuel R. Turpin, an elected member of the Indiana House of Representatives, with the intent that such money would control the performance of acts related to the employment or function of Samuel R. Turpin as a public servant, that is: with the intent that Samuel R. Turpin would act to support or promote legislative measures and decisions that would result in economic gain to American Consulting Engineers, Inc.

(Wurster Record, 26–27).

The defendants contend that a specific quid pro quo is an essential element of the offense of bribery that must be alleged in an indictment. Ind.Code § 35–44–1–1(a)(1) provides as follows:

A person who ... confers, offers, or agrees to confer on a public servant, either before or after the public servant becomes appointed, elected, or qualified, any property except property the public servant is authorized by law to accept, with intent to control the performance of an act related to the employment or function of the public servant ... commits bribery, a Class C felony.

Ind.Code § 35–44–1–1(a)(2) provides as follows:

A person who ... being a public servant, solicits, accepts, or agrees to accept, either before or after he becomes appointed, elected, or qualified, any property, except property he is authorized by law to accept, with intent to control the performance of an act related to his employment or function as a public servant ... commits bribery, a Class C felony.

Whether a specific and explicit quid pro quo is an essential element of proof under the Indiana bribery statute has never been directly addressed in Indiana. The defendants submit that the statute is comprised of four specific elements: (1) the conferring or offering of property; (2) to a present or future public servant; (3) with the intent to control the performance of an act related to the public servant's functions; and (4) the public servant is not authorized to accept the property. The defendants contend that the indictment fails to allege facts sufficient to support elements (3) and (4).

Because the indictment is silent as to the particular *act* for which Wurster and Conner allegedly bribed Turpin, the indictment cannot stand. The State concedes that it has no evidence of Turpin committing a specific prohibited act to benefit ACE. In fact, the essence of the State's entire case against the defendants is based on the so-called "generalized bribe" theory. That is, that the payment of money to a public official with the intent to generally influence said official constitutes a bribe under Indiana law. Indiana's bribery statute prohibits public servants from accepting property for the forbidden purpose; however, it specifically exempts "property the public servant is authorized by law to accept." Ind.Code § 35–44–1–1(a)(1). Turpin was authorized by statute to accept compensation for part-time employment. We hasten to add that there is likely some action in every legislative session that could be characterized as assisting one of our state legislator's part-time employer or spouse's employer. In our state's system of part-time citizen legislators, we must accept and anticipate that these public servants will hold employment outside of the legislature. We must also accept and anticipate that some degree of conflict is inherent in the system.

The defendants rely on a series of cases beginning with *McCormick v. U.S.*, 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). In *McCormick*, the Supreme Court held that an explicit quid pro quo is a required element to sustain a conviction of extortion under the federal extortion statute. 500 U.S. at 274, 111 S.Ct. 1807. McCormick was a West Virginia state legislator who essentially accepted campaign contributions from foreign doctors in exchange for sponsoring favorable licensure legislation. The *McCormick* Court based its decision on a realistic understanding of the management and financing of political campaigns. In reaching its decision, the *McCormick* court quoted the following passage from the Department of Justice Manual:

[C]ampaign contributions will not be authorized as the subject of a Hobbs Act prosecution unless they can be proven to have been given in return for the performance of or abstaining from an official act; *otherwise any campaign contribution might constitute a violation.*

500 U.S. at 273, 111 S.Ct. 1807 (emphasis provided).

In *U.S. v. Allen*, 10 F.3d 405 (7th Cir. 1993), the issue arose whether Indiana would follow *McCormick*. Allen was a civilian internal affairs investigator for the Lake County Sheriff's Department who accepted money and gifts from a gambling operation sting set up by the F.B.I. He was subsequently charged with a RICO violation. Each time Allen accepted money, it was done ostensibly in exchange for tickets to political fundraisers or in support of some political function. Allen maintained that the money and gifts he received were legitimate campaign contributions, and that he never promised to provide protection to the gambling operation.

At trial, he proposed a jury instruction that would have informed the jury that campaign contributions cannot be considered bribes unless they were accepted "in return for an explicit promise or undertaking to perform or not to perform an official act." 10 F.3d at 410. The district court refused to give the instruction, holding that unlike the Hobbs Act, the Indiana bribery statute does not require an explicit quid pro quo. Instead, the district court said, " 'in Indiana, it is the soliciting or the receiving of money by an official to influence him with respect to his official duties that is the gravamen of the offense of bribery.' " 10 F.3d at 410 (quoting *U.S. v. Allen*, No. HCR 91–93, at 17–18 (N.D.Ind.1992)). Allen argued that the district court's distinction was meaningless, because the concerns that led the Supreme Court to adopt the quid pro quo requirement

in *McCormick* existed with regard to the Indiana bribery statute as well. Although it did not need to reach the ultimate issue as to whether the District Court erred by refusing Allen's instruction, the Seventh Circuit lent some approval to Allen's argument:

> This argument is not without force. McCormick recognized several realities of the American political system. Money fuels the American political machine. Campaigns are expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises. It would be naive to suppose that contributors do not expect some benefit—support for favorable legislation, for example—for their contributions. To hold that a politician committed extortion merely by acting for some constituents' benefit shortly before or after receiving campaign contributions from those constituents " 'would open to prosecution … conduct that … in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the nation.' "

10 F.3d at 410–411 (quoting *McCormick*, 500 U.S. at 272, 111 S.Ct. 1807).

The State argues that the *McCormick* line of cases is distinguishable primarily because they are uniquely campaign contribution cases. The State submits that this case involves a sham employment relationship that amounted to an outright bribe. The State relies on several non-campaign contribution cases in which the various circuit courts held that a specific quid pro quo was not an essential element of the state's bribery statute. *See United States v. Jackson*, 72 F.3d 1370 (9th Cir.1995) (California bribery statute does not require explicit quid pro quo to pass First Amendment muster); *United States v. R.J. L'Hoste & Company, Inc.*, 609 F.2d 796 (5th Cir.1980) (Inquiry under Louisiana statute is whether the gift or money was given, not as a quid pro quo for specific action, but with the intent to influence the official conduct of the public servant). However, the bribery statutes in California and Louisiana contemplate merely the *intent to influence* official conduct; whereas the Indiana statute contemplates "intent to control the performance of *an act* related to the employment … of the public servant." Ind. Code § 35–44–1–1(a)(1) (emphasis added).[3]

■■■ The constitutions of Indiana and the United States both require that an accused be informed of the nature and cause of the accusation against him. *Williams v. State*, 677 N.E.2d 1077, 1080 (Ind.Ct.App. 1997). The accused in a criminal case has the right to require that the allegations contained in the charging instrument state the crimes charged with sufficient certainty to enable him to anticipate the evidence adduced against him at trial, thereby enabling him to marshal evidence in his defense. *Moran v. State*, 477 N.E.2d 100, 103 (Ind.Ct. App.1985). The offense charged must also be described with sufficient particularity to permit a defense of double jeopardy in the event of a subsequent prosecution. *Taylor v. State*, 677 N.E.2d 56, 67 (Ind.Ct.App.1997), *trans. denied.* The indictment must state the crime charged in direct and unmistakable terms. *Moran*, 477 N.E.2d at 103 (citing *Garcia v. State*, 433 N.E.2d 1207, 1209 (Ind. Ct.App.1982)). Any reasonable doubt as to the offense charged must be resolved in favor of the accused. *Garcia*, 433 N.E.2d at 1209.

■■■ The indictment against Turpin charges simply that Turpin received money from ACE, by and through its agents, Wurster and Conner, "with the intent that such money would control the performance of acts related to" Turpin's employment. Similarly, the indictment against Wurster and Conner

---

**3.** California Penal Code § 7(6) provides:
The word "bribe" signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, *with a corrupt intent to influence*, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity.

The Louisiana bribery statute defines bribery as "the giving or offering to give, directly or indirectly, anything of apparent present or prospective value … *with the intent to influence his conduct* …" La.Rev.Stat.Ann. § 14:118(1).

charges simply that Wurster and Conner as officers of ACE conferred money upon Turpin "with the intent that such money would control the performance of acts related to [Turpin's employment as a public servant], that is: with the intent that [Turpin] would act to support or promote legislative measures and decisions that would result in economic gain to [ACE]." We believe that Counts I and II of the indictment fail the specificity test. Without a specific description of how Turpin would "act" or what "act" he is alleged to have engaged in that resulted in, or was designed to result in, economic gain to ACE, the defendants have no way to anticipate the evidence that may be presented against them, nor are they able to marshal evidence in their defense. It is neither fair nor reasonable to have the defendants speculate, at their peril, as to the particular activity they may or may not have engaged in.

In addition, the offense charged must be described with sufficient particularity to permit the defense of double jeopardy in the event of a subsequent prosecution. *Wine v. State*, 637 N.E.2d 1369, 1374 (Ind.Ct.App. 1994), *trans. denied*. Here, it is conceivable that the State could prosecute these defendants based upon one set of "acts," have an unfavorable result at trial, and then prosecute for a second time based upon a different set of "acts." For these reasons, we hold that the indictments as they stand do not enable the defendants to anticipate the proof of the State's case, and do not protect the defendants from future prosecutions under the same or similar facts. Accordingly, we reverse the trial court's denial of the defendants' motion to dismiss Counts I and II of the indictment.

### III. Motion to Dismiss Count III Lobbying Law

Wurster contends that the trial court erred in denying his motion to dismiss Count III of the indictment charging him with violating Indiana's lobbying laws. Specifically, Wurster contends that the lobbying laws do not impose a reporting duty upon an officer or director of a corporation.

Count III of the indictment provides as follows:

During December, 1995 and January, 1996, in Marion County, Indiana, James A. Wurster, being an agent and/or officer or controlling person for American Consulting Engineers, Inc., did knowingly violate I.C. 2–7–2 and/or I.C. 2–7–3, by knowingly failing to file a registration statement and/or activity report with the Indiana Lobby Registration Commission, for and on behalf of American Consulting Engineers, Inc., which registration statement and/or activity report was required to be filed by law after [ACE, Inc.], through its agent, James A. Wurster, had, in December, 1995, paid more than five hundred dollars ($500.00) to Indiana Motor Truck Association, Inc. for lobbying.

(Wurster Record, 27).

The State alleges that in December of 1995, Wurster agreed to raise $50,000.00, including $11,250.00 from ACE, to help hire former Democratic House Speaker Michael Phillips as a lobbyist. The money raised by Wurster was to be matched by the IMTA. The lobbying campaign was allegedly aimed at passage of a bill that would have diverted gasoline taxes to highway funding, which would potentially mean millions for ACE. It is further alleged that Wurster concealed this relationship with Phillips in an effort to protect Turpin and his relationship with ACE.

### A. Indiana Lobby Registration Commission Filing Requirements

Indiana law imposes a duty upon Indiana lobbyists to file an annual registration statement and a semi-annual activity report with the Indiana Lobby Registration Commission. Ind.Code § 2–7–2–1 essentially imposes a mandatory filing requirement for Indiana lobbyists. Specifically, Lobbyists are required to file a registration statement under oath and pay a filing fee of $100 to the Indiana Lobby Registration Commission.

Ind.Code § 2–7–2–2(a) provides in pertinent part that "[e]ach registration statement shall be filed not later than January 15 or within fifteen (15) days after the registrant becomes a lobbyist, whichever is later." Ind. Code § 2–7–2–2(b) imposes a late registration fee of $10 per day for each day after the

deadline until the statement is filed, and Ind.Code § 2–7–2(c) limits the late registration fee to a maximum penalty of $100.

Ind.Code § 2–7–3–1 imposes a mandatory duty upon Indiana lobbyists to file under oath a semiannual activity report with the commission. A separate activity report must be filed for each person from whom the lobbyist receives payment for lobbying.

### B. Definition of "Lobbyist"

Wurster argues that he cannot be held criminally liable for a violation of the lobbying statute because he is not a lobbyist. A "lobbyist" is defined in the Indiana Code as follows:

"Lobbyist" means any *person* who:

(a) engages in *lobbying;* and

(b) in any registration year, receives or expends an aggregate of five hundred dollars ($500) in compensation or expenditures reportable under this article for lobbying, whether the compensation or expenditure is solely for lobbying or the lobbying is incidental to that individual's regular employment.

Ind.Code § 2–7–1–10. (Italics added). "Person" means "a human being, corporation, limited liability company, partnership, association, firm, or educational institution." Ind.Code § 2–7–1–12. "Lobbying" means "communicating by any means, or paying others to communicate by any means, with any legislative official with the purpose of influencing any legislative action."

 Wurster did not engage in any of the above defined activities in an individual capacity. In December of 1995, a number of Indiana engineering firms, including ACE, made payments to the IMTA. ACE sent one check for $10,000 and a second check for $2,500. There was considerable confusion early in 1996 regarding the necessity of filing with the Indiana Lobby Registration Commission. Out of an abundance of caution, ACE filed its registration statement and activity report in July of 1996. ACE also paid the maximum $100 penalty for its late filing. In *Day v. State,* 168 Ind.App. 68, 341 N.E.2d 209 (1976), we addressed whether an officer of an association could be held criminally liable for failing to file an expense statement on behalf of the association. Applying a predecessor statute, we held that the statute did not apply to Day, because he did not pay a lobbyist in an individual capacity. *Id.* at 211. Specifically, the court stated as follows:

The State urges a statutory construction which would impose the duty of filing a statement of expenses upon all officers and all members of the association with knowledge of payments made or expenses incurred for a legislative agent. This we cannot do. The statute is not ambiguous. The statute clearly imposes the duty on the association as a separate entity—not on the officers or members of the association.

*Day,* 341 N.E.2d at 211–12. The holding and rationale of the *Day* opinion applies with equal force to Wurster as an officer of ACE. Nowhere in the definition of "person" does the statute include an officer or director of a corporation. Had the legislature wished to expose such individuals to criminal liability, it would have explicitly included them in the definition. We therefore reverse the trial court's denial of Wurster's motion to dismiss Count III of the indictment.

### IV. Filing a Fraudulent Report Turpin: Counts VI–X

Turpin argued in his motion to dismiss Counts VI through X that the statute proscribing filing a fraudulent report is unconstitutionally vague, and Counts VI through X are fatally duplicitous. Counts VI through X of the indictment charge Turpin, acting as treasurer of a candidate's committee, with filing fraudulent Report of Receipts and Expenditures of a Political Committee with the Indiana Election Commission. (Turpin Record, 42–44). Ind.Code § 3–14–1–13 provides that "[a] person who knowingly files a report required by IC 3–9 that is fraudulent commits a Class D felony." Ind.Code § 3–9–3–4 provides in pertinent part that campaign contributions may be used only to defray expenses "reasonably related" to the campaign, political activity, or activity "related" to service in an elected office. Turpin contends that this language is unconstitutionally vague.

When a statute is challenged on constitutional grounds, we begin with the presumption of constitutionality and place the burden on the challenging party to show otherwise. *Bemis v. State,* 652 N.E.2d 89, 92 (Ind.Ct.App.1995). Under basic principles of due process, a statute is void for vagueness if its prohibitions are not clearly defined. *Johnson v. State,* 648 N.E.2d 666, 670 (Ind. Ct.App.1995). A statute is not unconstitutionally vague if "individuals of ordinary intelligence would comprehend it to adequately inform them of the conduct to be proscribed. The statute need only inform the individual of the generally proscribed conduct; a statute need not list, with itemized exactitude, each item of conduct proscribed." *Guidry v. State,* 650 N.E.2d 63, 67 (Ind.Ct.App.1995) (quoting *State v. Downey,* 476 N.E.2d 121, 122 (Ind.1985), *reh'g denied* ). Furthermore, a statute is void for vagueness only if it is vague as applied to the precise circumstances of the case. *Mallory v. State,* 563 N.E.2d 640, 644 (Ind.Ct.App.1990), *trans. denied.*

The statute in question is not void for vagueness. Ind.Code § 3–9–3–4 proscribes expenditures of campaign contributions on expenses that are not "reasonably related" to the campaign. Ind.Code § 3–14–1–13 proscribes the knowing fraudulent filing of a report required under § 3–9. First, we note that the State is charging Turpin with knowingly filing a fraudulent report, not with spending campaign contributions on personal expenses. An intentional course of conduct is required in order for Ind.Code § 3–14–1–13 to be violated, and we cannot say that people of ordinary intelligence would be unable to distinguish between the proscribed and permissible conduct. We therefore affirm the trial court's denial of Turpin's motion to dismiss Counts VI through X.

Turpin also contends that Counts VI through X are fatally duplicitous. It is alleged in Count VI of the indictment that on October 29, 1994, Turpin failed to report a $4,580.00 expenditure to Manual White. It is further alleged in Count VI that Turpin knowingly reported an expenditure of the Sam Turpin Committee in the sum of $580.00 for a reception, when in fact, such reception never took place. Count VII of the indict-

ment alleges that on January 17, 1995, Turpin reported expenditures by the Sam Turpin Committee to Citibank Visa and the Columbia Club. These expenditures were reported as valid expenditures of a candidate's committee. However, they were alleged to be in whole or in part personal expenses. It is alleged in Count VIII that on January 17, 1996, Turpin reported various expenditures by the Committee to various entities including, but not limited to, Kroger, Atlas Supermarket, the Toddy Shoppe, Citibank Visa, the Columbia Club, and Brownsburg World Travel, as valid expenditures of a candidates committee, when in fact such expenditures were in whole or in part personal expenses. Count IX of the indictment alleges that on April 26, 1996, Turpin reported a committee expense to Citibank Visa, when such expense was in fact personal. Finally, Count X of the indictment alleges that on January 14, 1997, Turpin failed to report and disclose contributions to the Turpin Committee from April 12, 1996 through December 31, 1996 in the amount of $1,000.00. It is further alleged in Counts VI through X that Turpin knowingly overstated the amount of cash on hand available to the Sam Turpin Committee at the end of the respective reporting period.

In *Cliver v. State,* 666 N.E.2d 59, 67 (Ind.1996), *reh'g denied,* the supreme court held that the State may allege multiple acts in one count of an offense. While each of the above counts of the indictment charge multiple acts that constitute the fraudulent conduct required to violate Ind.Code § 3–14–1–13, there is no prohibition against such charging technique. As the supreme court stated in *Cliver,* "[t]he State merely presented the jury with alternative ways to find the defendant guilty as to *one element.*" *Id.* at 67. There being no cause for dismissal of Counts VI through X of the indictment, we affirm the trial court's denial of Turpin's motion to dismiss.

### V. *Perjury, Turpin: Count XI*

Turpin contends that Count XI of the indictment charging him with perjury should be dismissed because Marion County is an improper venue. Count XI of the indictment alleges that Turpin made false statements in

an affidavit to the Indiana Bureau of Motor Vehicles. However, the indictment alleges that these activities took place in Marion County, although the State stipulated at argument on the motion to dismiss that Turpin submitted the fraudulent document to the BMV in Hendricks County. (Turpin Record, 520).

 Except as otherwise provided by law, criminal actions are to be tried in the county where the offense was committed. Ind.Code § 35–32–2–1; *Kindred v. State*, 540 N.E.2d 1161, 1167 (Ind.1989). If an offense is committed in Indiana and it cannot readily be determined in which county the offense was committed, trial may be in any county in which an act was committed in furtherance of the offense. *Id.* If the commission of an offense is commenced in one county and is consummated in another county, trial may be had in either of the counties. *Andrews v. State*, 529 N.E.2d 360, 363 (Ind.Ct.App.1988), *reh'g denied, trans. denied.*

 It is the State's burden to prove that the offenses charged occurred in the county identified in the charging information. Venue must be proven by a preponderance of the evidence and may be established by circumstantial evidence. *Buzzard v. State*, 669 N.E.2d 996, 997 (Ind.Ct.App.1996). If there is a failure of proof at trial and the evidence does not show that venue lies in Marion County, Turpin will be entitled to judgment on the evidence pursuant to Ind.Trial Rule 50. However, any variance between the pleading and the proof with regard to the venue statement is not likely to be deemed a material variance.

 A variance is an essential difference between the pleading and the proof, and not all variances are fatal. *Mitchem v. State*, 685 N.E.2d 671, 677 (Ind.1997). A variance requires reversal of a conviction only in cases where the defendant was misled in the preparation of his defense and the risk of double jeopardy is present. *McCullough*, 672 N.E.2d at 448. In *McCallister v. State*, 217 Ind. 65, 26 N.E.2d 391 (Ind.1940), the supreme court held that the variance between the venue statement in the information for buying stolen goods and the proof was not a material variance. Specifically, the court stated as follows:

> It is inconceivable that it would have made any difference to the defense, or the opportunity to prepare it, whether the property was stolen in Vigo County or in some other county, and the appellant does not suggest or point out that he was in any way prejudiced by the variance. Under such circumstances the variance must be considered immaterial.

26 N.E.2d at 394. Our supreme court has also held that a charging instrument must state the place of the offense with specific particularity to show that the offense was committed within the jurisdiction of the court where the charge is to be filed. *Benham v. State*, 637 N.E.2d 133, 137 (Ind.1994). The 1869 case of *Carlisle v. State*, 32 Ind. 55, is also instructive on this issue. In deciding the materiality of an alleged variance in that case, the court stated as follows:

> The objection to the evidence in this case was not well taken; that the variance between the allegation in the indictment, as to the place where the offense was committed, and the proof on the trial, was not material, both places being within the jurisdiction of the court.

*Id.* at 59. Similarly here, we find that the State has alleged venue with sufficient particularity to prevail on Turpin's motion to dismiss the indictment. If there is a failure of proof on venue at the close of the State's case-in-chief, Turpin is entitled to move for a judgment on the evidence pursuant to Ind.Trial Rule 50. We affirm the trial court's denial of the motion the dismiss Count XI.

## CONCLUSION

Accordingly, the trial court's denial of Turpin's motion to dismiss Counts VI through X and Count XI of the indictment is affirmed, as is the defendants' motion to dismiss the indictment in its entirety. The trial court's denial of the defendants' motion to dismiss Counts I and II of the indictment charging bribery is reversed, and the trial court's de-

nial of Wurster's motion to dismiss Count III of the indictment is reversed.

We affirm in part and reverse in part.

RUCKER, J., and GARRARD, J., concur.