Mmoja AJABU, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 22A01–9605–CR–143.

Court of Appeals of Indiana.

Feb. 28, 1997.

Transfer Denied April 23, 1997.

Kenneth T. Roberts, Kevin Scionti, Roberts & Bishop, Indianapolis, for Appellant–Defendant.

Pamela Carter, Attorney General, James D. Dimitri, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Mmoja Ajabu appeals from his convictions after a bench trial on two counts of Intimidation as Class D felonies. Ajabu was indicted by a special grand jury and subsequently found guilty of intimidating then Hamilton County Prosecuting Attorney Steven Nation and Debra Meyer, the mother of two murder victims.

We affirm.[1]

1. We heard oral argument on January 22, 1997.

### ISSUES

Ajabu presents two issues of first impression for our review, which we restate as:

1. Whether the instruction given to the grand jury to return an indictment was reversible error.

2. Whether the threats at issue were communicated in the manner required by the intimidation statute.

### FACTS

Mmoja Ajabu is the father of Kofi Ajabu. In March of 1994, Kofi and two other men were charged with murder, confinement, robbery and burglary in connection with the murders of Chris James, Nicholas Allemenos and Lisa Allemenos in Carmel. These murders were highly publicized. In April of 1994, then Hamilton County Prosecutor Steven Nation filed a request for the death penalty against Kofi and his two co-defendants. Nation held a press conference to announce that the State would seek the death penalty. Debra Meyer, mother of the slain Allemenos children, was present at the press conference and voiced her support for Nation's death penalty request.

On April 12, 1994, a hearing was held in the Hamilton Superior Court on the death penalty request. Following the hearing, Mmoja Ajabu spoke to television reporters outside the courtroom. Ajabu stated, "And I want to serve notice as a father that if my son is killed for something that he did not do, then there will be other death sentences carried out." Ajabu also stated that "she [Meyer] has reaped the benefit of the death, rape and pillaging of our people and our continent. Is she eligible for the death penalty?"

Jack Martin, the Chief of School Police for the Indianapolis Public Schools, had attended the hearing to show support for Ajabu's wife, who was his co-worker. Martin was present at the courthouse when Ajabu made his statement to the press. Martin testified that Ajabu threatened Nation and "the mother" of the Allemenos children and that Ajabu was "serious" when he spoke.

That afternoon William Booher, a staff writer for *The Indianapolis Star*, telephoned Ajabu at his home. Booher had learned of Ajabu's statements on a noon television report and from an Associated Press story. According to Booher's testimony, Ajabu verified for the reporter that he had stated "other death sentences would be carried out" and that he was referring to Meyer and Nation. Based upon this interview, Booher wrote an article which appeared in the April 13 edition of *The Star* quoting Ajabu that "if somebody kills him [Kofi] for something he did not do, then that'll make me take somebody's life. A whole bunch of people will die."

That same day, Derrik Thomas, a Channel 6 (WRTV) television reporter contacted Nation's office and asked to speak with Nation about Ajabu's statements. Nation's secretary, Ruth McCarley, spoke with Thomas and then informed Nation of what Ajabu had said. Robert Schneider, a reporter for *The Star*, contacted Meyer and informed her of Ajabu's statements. In response, both Nation and Meyer took security measures.

On April 13, 1994, the day after the hearing, Ajabu appeared as a guest on a WTLC radio talk show and elaborated on his previous statements. He was asked, "Why make a threat?" Ajabu stated that "all evidence indicates that he [Kofi] has not killed anyone. So now the prosecutor is saying that he is going to kill him [Kofi] for something that he [Kofi] didn't do." Ajabu explained, "I didn't make the rules. Steve Nation made the rules. I'm just playing the game." He continued, "I'm saying that if he [Kofi] is killed for something that he did not do, then I'm going to respond in kind."

Following the radio show, Ajabu was interviewed by Glendal Jones, a Channel 13 (WTHR) television reporter. During that interview Ajabu accused Nation of filing the death penalty request to advance his political career and asked, "Is his [Nation's] political career worth other people dying because he wants to kill my son?" When Jones asked him what he meant when he said that "other death sentences" would be carried out, Ajabu responded, "I meant exactly what I said," and "if they're going to kill my son for something that he did not do, then I'm going to

kill somebody for something that they did not do. They should have stopped Steve Nation from killing my son."

From April 12, 1994, through April 14, 1994, the Indianapolis media carried stories about Ajabu's threats. These stories included excerpts from Ajabu's statements outside the courtroom after the hearing on April 12 as well as his comments in subsequent newspaper, radio and television interviews. The television news coverage was broadcast on several local stations including Channel 6 (WRTV), Channel 13 (WTHR) and Channel 59 (WXIN). The stations broadcast Ajabu's statements numerous times in the Indianapolis area, including Hamilton County where Nation and Meyer were residents.

Nation moved for the appointment of a special prosecutor, and Madison County Prosecutor William Lawler was appointed. A special grand jury was then convened to consider Ajabu's statements. The grand jury heard testimony from witnesses and investigators and viewed video tapes, deliberated and then returned an indictment charging Ajabu with two counts of intimidation.

The trial court granted Ajabu's second motion for change of venue from the county under Criminal Rule 12 due to evidence of circumstances that may "substantially impair the ability to chose fair and impartial jurors in this cause." The case was then venued from Hamilton County to Floyd County where Ajabu waived a jury trial. After a bench trial, the trial court convicted Ajabu on both counts and sentenced him to three year concurrent sentences with two years suspended on each count, for a total executed term of one year to be served on home detention. Ajabu now appeals.

## DISCUSSION AND DECISION

### Issue One: Grand Jury Charge

■ Ajabu challenges one of the court's instructions to the grand jury. The instruction at issue stated:

The grand jury is now directed to hear evidence and take such further action and

proceedings as they deem advisable and to present their Report and Indictment to the Court.

Record at 52.[2] Ajabu twice moved to dismiss the special grand jury indictment alleging that the grand jury was erroneously instructed. The motion was denied first by Judge William Hughes of the Hamilton Superior Court and later by Judge Richard Striegel of the Floyd Superior Court. Ajabu alleges on appeal that this instruction required the grand jury to return an indictment, which invaded the province of the jury. Indiana Code § 35–34–2–4(j) provides that "the grand jury shall be the exclusive judge of the facts with respect to any matter before it." Ajabu contends that the instruction rendered the indictment against him fatally defective and, hence, that his subsequent convictions must be reversed. We cannot agree.[3]

■ A motion to dismiss is proper when the grand jury proceedings are defective. IND. CODE § 35–34–1–4(a)(3); *Sparks v. State*, 499 N.E.2d 738, 741 (Ind.1986). Grand jury proceedings are defective and the indictment shall be dismissed upon motion when the grand jury proceedings which resulted in the indictment were conducted in violation of Indiana Code § 35–34–2 *et seq.* IND. CODE § 35–34–1–7; *see Sparks*, 499 N.E.2d at 741. Indiana Code § 35–34–2–4(j) provides that the grand jury shall be the exclusive judge of the facts. An instruction that invades the province of the grand jury to determine whether the facts establish probable cause would be erroneous. The defendant has the burden of proving by a preponderance of the evidence every fact essential to support a

motion to dismiss. IND. CODE § 35–34–1–8(f).

■ The functions of a grand jury are not judicial; they are merely inquisitorial. *Adams v.State*, 214 Ind. 603, 605, 17 N.E.2d 84, 85 (1938). Grand jury proceedings are not a trial, or even an adversary proceeding. *Sisk v. State*, 232 Ind. 214, 217 110 N.E.2d 627, 629 (1953). Generally, the grand jury is an independent body which is charged with investigating the facts to determine "whether probable cause exists that a crime has been committed and whether an indictment (true bill) should be returned against one for such a crime." BLACK'S LAW DICTIONARY 855 (6th ed. 1990). Unlike a petit jury, the grand jury does not determine the guilt or innocence of the accused. Rather the grand jury determines if there is probable cause to believe that the accused has committed a crime.

■ Before the grand jury proceedings begin "the court shall give the grand jurors any instructions relating to the proper performance of their duties that the court considers necessary." IND. CODE § 35–34–2–3(f). To insist on the many procedural safeguards and evidentiary rules required at a trial would convert the grand jury procedure into a preliminary trial on the merits. *State v. Inthavong*, 402 N.W.2d 799, 801 (Minn. 1987). Accordingly, the instructions to a grand jury require less precision than those to a petit jury, *id.*, and the same rules of law which govern instructions to a petit jury may not apply to instructions given to a grand jury. However, like petit jurors, grand jurors rely on the judge's instructions for direction in reaching their decision, and an erroneous charge given to the grand jury

---

**2.** It is not clear from the record whether this instruction was actually read to the special grand jury. The instruction is contained in the court's order book, but it does not appear in the transcript of the instructions the trial judge gave the grand jurors after they were impaneled and before they retired to hear evidence.

**3.** Ajabu argues that the instruction presented to the grand jury was a mandatory instruction. Mandatory instructions are ones which attempt to set up a factual situation directing the jury to a certain result. *Keith v. Mendus,* 661 N.E.2d 26, 37 (Ind.Ct.App.1996). Mandatory instructions are disfavored in the law and our courts have

repeatedly cautioned trial judges about the danger of giving instructions which are mandatory in form. *Id.* However, the instruction in this case is not a "mandatory instruction" as defined in Indiana law. The instruction does not set up a factual situation which directs the jury to reach a certain result. The instruction is more like a peremptory instruction, an instruction given by a court to a jury which the jury must obey implicitly; as an instruction to return a verdict for the defendant, or for the plaintiff, as the case may be. BLACK'S LAW DICTIONARY 857 (6th ed. 1990). Regardless of how the instruction is described, it directs the jurors to return an indictment.

may constitute reversible error.[4]

■ Erroneous instructions will not invalidate an indictment absent a showing of prejudice. *Inthavong,* 402 N.W.2d at 802. To show prejudice, the instructions in their entirety must be so misleading or deficient that the fundamental integrity of the indictment process itself is compromised. *Id.*; 38A C.J.S. *Grand Juries* § 75 at 396 (instructions must be comprehensible, and must not be so misleading or incomplete as to substantially undermine integrity of proceedings); *see Sparks,* 499 N.E.2d at 741 (Article I, Section 12 of Indiana Constitution violated when proceedings of grand jury render indictment abhorrent to fundamental concept of fair and proper justice).

■ Here, the grand jury instruction at issue, which is similar to an instruction found in the Criminal Benchbook prepared by the Indiana Judicial Center, asked the jurors to present their indictment to the court.[5] Indictment is defined as "an accusation in writing found and presented by a grand jury, legally convoked and sworn, to the court in which it is impaneled, charging that a person therein named has done some act, or been guilty of some omission, which by law is a public offense, punishable on indictment." BLACK'S LAW DICTIONARY 772 (6th ed.1990). A true bill is also defined as "an indictment." *Id.* at 1508. Thus, to the extent the instruction here appears to command the return of an indictment or true bill it infringes upon the grand jurors' fact finding responsibility.

However, this does not end our inquiry. Before we will reverse an instruction given to a grand jury, the defendant must show prejudice to his substantial rights. *See Musgrave v. State,* 133 Ind. 297, 304, 32 N.E. 885, 888 (1892) (defects that do not affect substantial rights of defendant are not sufficient to require quashing of indictment or information); *Brown v. State,* 434 N.E.2d 144, 146 (Ind.Ct. App.1982) (presence of unauthorized persons during grand jury proceedings must result in prejudice to defendant's substantial rights). Ajabu must establish that the instructions as a whole were so misleading or deficient that the fundamental integrity of the grand jury proceedings itself were compromised.

In addition to the instruction at issue, the judge instructed the grand jury that:

> A grand jury is a body of impartial randomly selected folks to whom a series of witnesses and matters are presented and that grand jury's primary duty is to investigate the possibility of and make a determination as to whether or not probable cause exists to believe that one or more criminal offenses may have occurred.

Record at 55. The judge distinguished the grand jury function to investigate from the petit jury function to adjudicate. The special prosecutor also clearly articulated to the jurors that they were to determine "whether or not there's probable cause that a criminal charge should be brought" against Ajabu. The judge informed the jurors that the grand jury is to "make a report to the court as to whether or not you believe information you've received justifies bringing of criminal charges." Finally, the judge informed the jurors that they were to "fully, honestly, and impartially listen" to the matters placed before them and to "determine whether or not indictments will or will not be handed down

---

4. The State argues that we should adopt the rule announced in *United States v. Anderson,* 61 F.3d 1290 (7th Cir.1995). The defendant in *Anderson* alleged that due to prosecutorial misconduct, the grand jury proceedings were tainted. *Id.* at 1295. The court concluded that the only potential prejudice suffered by the defendant was that he may have been indicted without probable cause. *Id.* at 1297. The court went on to hold that because the defendant was convicted by a petit jury of the same charge, "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.* This rule bars review of grand jury proceedings if the defendant is subsequently convicted by a petit jury. It assumes that the defendant would have also been indicted if the grand jury proceedings had not been defective. We decline to adopt this rule because it places grand jury proceedings beyond judicial review.

5. The instruction found in the Criminal Benchbook states:

> The grand jury is now directed to hear evidence and to take such further action and proceedings as they deem advisable and to present their indictment(s) to the Court.

Indiana Judicial Center, *Benchbook Criminal* § 1.06 (1995).

and to do so in a fair and impartial manner without hope of reward and without fear."

Having reviewed the entire charge to the grand jury, as well as the transcript of the grand jury proceedings, we cannot say that Ajabu has shown prejudice. The instructions given to the grand jurors by the judge and the special prosecutor show that the jurors were not misled to believe that they were required to return an indictment. To the contrary, both the judge and the special prosecutor informed the jurors they were to investigate the facts and determine whether or not an indictment should be returned. Questions from the grand jurors also clearly show they understood their independent responsibility to judge the facts. Considering all the instructions given to the grand jury, we conclude that the jurors were not misled by one instruction to believe that they were required to return an indictment. We hold that the instruction to the grand jurors that they "present their ... indictment to the court" was erroneous but that Ajabu has not shown on the clear record of this case that the erroneous instruction affected the integrity of the grand jury proceedings and prejudiced his substantial rights.

### Issue Two: Intimidation

Ajabu also moved to dismiss the indictment on the basis that the evidence was insufficient as a matter of law to sustain his convictions for intimidation. We cannot agree.

Ajabu was charged with the intimidation of Nation and Meyer pursuant to Indiana Code § 35–45–2–1 which states in part:

(a) A person who communicates a threat to another person, with the intent that:

(1) the other person engage in conduct against his will; or

(2) the other person be placed in fear of retaliation for a prior lawful act; commits intimidation, a Class A misdemeanor.

(b) However, the offense is a:

(1) Class D Felony if:

(A) the threat is to commit a forcible felony;

(B) the person to whom the threat is communicated:

(i) is a law enforcement officer;

(ii) is a judge or bailiff of any court;

(iii) is a witness (or the spouse or child of a witness) in any pending criminal proceeding against the person making the threat; or

(iv) is an employee of a school corporation.

\* \* \* \* \*

(c) "Threat" means an expression, by words or action, of an intention to:

(1) unlawfully injure the person threatened or another person, or damage property;

\* \* \* \* \*

(4) unlawfully withhold official action, or cause such withholding;

Count I of the indictment charged that Ajabu communicated a threat to Nation with the intent that Nation engage in conduct against his will. It was Nation's official and exclusive duty as the Hamilton County Prosecuting Attorney to decide whether to request the death penalty against the murder suspects. The offense was charged as a Class D felony because the threat was meant to intimidate Nation in his capacity as a law enforcement officer not to carry out the duties of his office. I.C. § 35–45–2–1(b)(1)(B)(i).

Count II of the indictment charged that Ajabu communicated a threat to Meyer with the intent to place her in fear of retaliation for her prior lawful act. Meyer had expressed her support for Nation's decision to seek the death penalty, which was her right. The offense was charged as a Class D felony because the threat was to commit a forcible felony. I.C. § 35–45–2–1(b)(1)(A). A forcible felony is a felony that involves the use or threat of force against a human being or in which there is imminent danger of bodily injury to a human being. IND. CODE § 35–41–1–11. Meyer testified that Ajabu's threats had put her in fear.

Whether intimidation has occurred is a question of fact. *See Owens v. State*, 659 N.E.2d 466, 474 (Ind.1995). Whether a communication is a threat is an objective question for the trier of fact. *Id.* Here, there was sufficient evidence from

which the trial court could determine that Ajabu's statements were threats and that the threats were made with the intent that Nation engage in conduct against his will and to place Meyer in fear of retaliation for her prior lawful act.

However, Ajabu argues that as a matter of law the statements he made through the media were not communicated to another person in the manner required by the intimidation statute. Neither Nation nor Meyer was present when Ajabu made his statements. Ajabu contends that under the statute a threat must be communicated directly to the victim. Thus, he reasons, intimidation could not have occurred.

■ The primary task when construing statutes is to determine and implement the intent of the legislature. *Indiana Dep't of Rev. v. Fort Wayne Nat'l Corp.,* 649 N.E.2d 109, 113 (Ind.1995). As this is a penal statute, the terms are to be strictly construed against the State. *Spangler v. State,* 607 N.E.2d 720, 723 (Ind.1993). Any ambiguity must be resolved against imposing the penalty, and only those cases which are clearly within its meaning and intention can be brought within the statute. *State v. McGill,* 622 N.E.2d 239, 240 (Ind.Ct.App. 1993).

■ Undefined words in a statute are given their plain, ordinary and usual meaning. IND. CODE § 1–1–4–1(c). Courts may consult English language dictionaries to ascertain the plain and ordinary meaning of a statutory term. *Ashlin Transp. Serv., Inc. v. Indiana Unemployment Ins. Bd.,* 637 N.E.2d 162, 167 (Ind.Ct.App.1994). "Communicate" is defined as "to make known; impart" and "to transmit." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 269 (1981). The definition of "communicate" requires that an individual make a thing known or transmit information to another.

■ The best evidence of legislative intent is the language of the statute itself. *Y.A. v. Bayh,* 657 N.E.2d 410, 416 (Ind.Ct. App.1995). The text of the intimidation statute does not limit the phrase "communicates a threat to another person" to only those threats made directly to or in the presence of the threatened party. The word communicate is not modified in any way. The word "communicate" encompasses those threats made known or transmitted to another person, and the statute does not limit the means utilized to convey the threat. Such threats include those a person makes known to the victim through the print, radio or television media with the requisite intent.

Still, Ajabu argues that under our opinion in *Bolen v. State,* 430 N.E.2d 398 (Ind.Ct. App.1982) the person alleged to be threatened must be present for the threat to be communicated. In *Bolen,* the defendant told a police officer that he was going "to get" and "to kill" the county prosecutor and showed the officer a clip from an automatic weapon in his van. On appeal, Bolen argued that evidence of these conversations should not have been admitted because it was irrelevant to the charge. We determined that the statements were admissible, although they "may not have necessarily constituted a crime inasmuch as [the prosecutor] was not present at the time." *Id.* at 401. Unlike the threat in *Bolen* which the defendant sought to exclude because it had been communicated solely to the police officer, Ajabu's threats were spoken before microphones and televisions cameras and communicated through the media to members of the public, including Nation and Meyer.

Ajabu admitted at trial that he was "prompted" to make his initial statement outside the courtroom by Nation's actions and Meyer's comments. However, he denied that his statements were directed toward them and claimed that his statements neither included nor excluded anyone in particular. Ajabu's contention that he did not threaten to harm Nation and Meyer is not well taken because the intimidation statute applies whether the threat is made to unlawfully injure the person threatened or another person. I.C. § 35–45–2–1(c)(1).

Ajabu also explained that his statements were made out of a father's concern for his son. We do not doubt that Ajabu spoke out of anguish for his son's dilemma and a sincere concern for his son's welfare. It was Ajabu's contention that Kofi was not an ac-

complice but was merely present at the scene of the crimes and that to impose the death penalty on his son for merely having been present would be unjust. However, Ajabu not only protested the injustice he feared might occur but threatened others with harm. Ajabu's statements were not idle or private comments but messages which he repeatedly and emphatically sought to convey through the news media. In his first statement Ajabu said, "I want to serve notice," and in a subsequent television interview he declared, "I am putting the world on notice."

The Indianapolis print, radio and television media market includes Hamilton County. The evidence supports the conclusion that Ajabu used that media to communicate threats that he knew or had good reason to believe would reach Nation and Meyer, with intent to influence Nation's conduct as a law enforcement officer against his will and to place Meyer in fear of retaliation for having supported Nation's death penalty request. This was intimidation under our statute.

Affirmed.

ROBERTSON and RUCKER, JJ., concur.