# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 24 2018, 7:58 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael G. Moore
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brittani Whitlock, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | May 24, 2018 <br><br> Court of Appeals Case No. <br> 49A02-1706-CR-1371 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Ronnie Huerta, Commissioner <br><br> Trial Court Cause No. <br> 49G09-1509-F6-31989 |

**Pyle, Judge.**

[1] Brittani Whitlock ("Whitlock") appeals, following a jury trial, her two convictions for Level 6 felony intimidation.[1] Whitlock argues that there was insufficient evidence to support her two convictions. Concluding that Whitlock's arguments are merely a request to reweigh the evidence, we deny this request and affirm her two intimidation convictions.

[2] We affirm.

## Issue

Whether sufficient evidence supports Whitlock's convictions.

## Facts

[3] In September 2015, Whitlock and her three young children ("the children")[2] were living with Whitlock's grandmother ("Grandmother"). During the late evening of September 8, 2015, Grandmother became concerned with Whitlock's treatment of the children and called 911. Indianapolis Metropolitan Police Department ("IMPD") Officers Ryan Archer ("Officer Archer"), Joshua Murphy ("Officer Murphy"), and Donald Jones ("Officer Jones") were dispatched to Grandmother's house. Upon their arrival, they spoke to Grandmother, who was "upset" and told them that she could not control Whitlock and that she was "scared" for the children. (Tr. Vol. 2 at 66, 87).

---

[1] IND. CODE § 35-45-2-1.

[2] The children were four years old, three years old, and one year old.

[4] Grandmother took the officers back to Whitlock's bedroom, where she was with the children. After Grandmother opened the door, Whitlock told the officers that she "hate[d] the fucking police" and yelled for them to leave. (Tr. Vol. 2 at 68-69). The officers stayed in the room, and Officers Archer tried to talk to Whitlock. She yelled at him and told him that "if she [wa]s not under arrest that [he] need[ed] to get the fuck out." (Tr. Vol. 2 at 89). After Whitlock yelled, her one-year-old child started to cry. Officer Archer tried to keep the children "calm" by talking to them and giving them stickers and high fives. (Tr. Vol. 2 at 89). Whitlock instructed her children to stop talking to the officers and told the children that the officers "like[d] to kill black people" and "like[d] to shoot people." (Tr. Vol. 2 at 89).

[5] The officers went into the living room with Grandmother, and she told the officers that Whitlock suffered from bipolar disorder and had not taken her medicine. Grandmother also stated that she was "concern[ed] that [Whitlock] [wa]s going to hurt [the children]." (Tr. Vol. 2 at 69). Officer Archer called the Department of Child Services ("DCS"), and the officers waited for a Child Protective Services ("CPS") worker to come to the house.[3]

[6] As the officers were in the living room with Grandmother, Whitlock walked into the room with her children. Whitlock was talking on the phone to someone, and she laughed and said "[f]uck the police . . . they are in my living

---

[3] During the trial, the witnesses interchangeably referred to both DCS and CPS.

room[.]" (Tr. Vol. 2 at 70). Whitlock yelled for the officers to get out, and Officer Archer told Whitlock that he had called CPS and that the officers would not leave until they had spoken with CPS. Whitlock became "more enraged" and "scream[ed]" and "cuss[ed]" at the officers. (Tr. Vol. 2 at 126, 127). Whitlock then played two songs, both titled "Fuck the [P]olice[,]"[4] on a Bluetooth speaker and "ha[d] her kids dance and flip the officers off." (Tr. Vol. 2 at 71). Whitlock replayed the songs, walked in and out of the house, and refused to talk to the officers. Whitlock told the person on the phone that "she was going to get her kids in the basement, [and] have her boys drive by and shoot [them] up; shoot the police up" and "shoot these fucking pigs." (Tr. Vol. 2 at 72, 102). As she said these words, she looked at the officers. Whitlock also took photographs of the officers and told them that "she was going to post them on Facebook so her people w[ould] know who [the officers] [we]re so they c[ould] kill [the officers]." (Tr. Vol. 2 at 104). Additionally, Whitlock mentioned Officer Perry Renn ("Officer Renn"), a police officer who had been shot and killed in the line of duty in July 2015, and told the officers, "Fuck Perry Renn" and "Fuck him, he deserved it." (Tr. Vol. 2 at 103, 154). The officers waited for approximately an hour for the CPS worker to arrive at the house, and during that time, Whitlock played the "Fuck the Police" songs "the entire time [the officers] were there." (Tr. Vol. 2 at 96).

---

[4] One song was by NWA, and the other song was by Lil Boosie.

[7]     When CPS worker, Asha Alvarado ("Alvarado"), arrived at the house, Whitlock was still playing the songs and was talking on her phone. Officer Archer informed Alvarado that Grandmother was "very upset about how [Whitlock] physically and verbally abuses her children." (Tr. Vol. 2 at 133). Whitlock was "[a]ngry" and "hostile," and she "cuss[ed] and "scream[ed]" at Alvarado and the officers. (Tr. Vol. 2 at 104). Alvarado found the scene in the house to be "[c]haotic[.]" (Tr. Vol. 2 at 175). Whitlock continued to play the songs, talk on her phone, and walk around the house. The officers determined that they were going to take Whitlock for a psychological evaluation, and Alvarado decided that CPS was going to file a "petition to keep the children in their home." (Tr. Vol. 2 at 192). Alvarado informed Whitlock and talked to her about placing the children with Grandmother. Whitlock "became upset[,]" refused placement with Grandmother, and said that "if they were going to be taking her[,]" then "she wanted [CPS] to place her children in foster care." (Tr. Vol. 2 at 177). As Alvarado started to step outside to call her supervisor, Whitlock told the person on the phone that he "should come over and follow the CPS worker home and harm her" or "take care of her[.]" (Tr. Vol. 2 at 73, 177). Alvarado then walked outside, called her supervisor, and informed the supervisor of what Whitlock had said.

[8]     The State charged Whitlock with two counts of Level 6 felony intimidation. The first count was for Whitlock's threat to Alvarado, and the second was for Whitlock's threat to Officer Archer. The trial court held a jury trial on April 5, 2017. The State presented testimony from Alvarado and Officers Archer,

Murphy, and Jones, who testified to the facts above. The jury found Whitlock guilty as charged. For each conviction, the trial court imposed a 725-day sentence with 180 days executed in jail and 545 days suspended to probation, and it ordered these sentences to be served concurrently. Whitlock now appeals.

# Decision

[9] Whitlock argues that the evidence was insufficient to support her two intimidation convictions.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original).

The intimidation statute provides that a person who "communicates a threat to another person, with the intent . . . that the other person be placed in fear of retaliation for a prior lawful act" commits intimidation as a Class A misdemeanor. I.C. § 35-45-2-1(a)(2). The offense is a Level 6 felony when the threat is to commit a forcible felony,[5] I.C. § 35-45-2-1(b)(1)(A), or when the person to whom the threat is communicated is a law enforcement officer. I.C. § 35-45-2-1(b)(1)(B)(i). To establish intimidation, the State must specifically identify a legal act by the victim and "establish that the legal act occurred prior to the threat and that the defendant intended to place the victim in fear of retaliation for that act." *Casey v. State*, 676 N.E.2d 1069, 1072 (Ind. Ct. App. 1997).

We first review Whitlock's challenge to her intimation conviction relating to Alvarado. In order to convict Whitlock of Level 6 felony intimidation as charged in Count 1, the State was required to prove beyond a reasonable doubt that Whitlock communicated a threat to commit a forcible felony against Alvarado, i.e., threatened to have someone follow Alvarado and "take care of her" or "kill her," with the intent to place her in fear of retaliation for the prior lawful act of "conducting a child welfare investigation[.]" (App. Vol. 2 at 23).

---

[5] A "forcible felony" is "a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being." I.C. § 35-31.5-2-138.

[12] Whitlock argues that: (1) the evidence was insufficient to show that she communicated a threat to Alvarado; and (2) assuming her statement constituted a threat, there was "no clear nexus" between Alvarado's prior lawful act of conducting a child welfare investigation and Whitlock's threat. (Whitlock's Br. 11).

[13] In regard to the "threat" element, Whitlock contends that the statement she made about having the person on the phone follow Alvarado and harm her was "not a threat to Alvarado" because Whitlock did not make the statement directly to Alvarado and because Alvarado merely "overheard" the statement while Whitlock was talking on the phone to the other person. (Whitlock's Br. 10). Whitlock contends that her statement to have the person on the phone follow and harm Alvarado was merely a "suggestion about an act some unknown person should do." (Whitlock's Br. 10).

[14] We reject Whitlock's suggestion that her words did not constitute a threat. The intimidation statute defines "threat" as an "expression, by words or action, of an intention to . . . unlawfully injure the person threatened . . . [or] commit a crime[.]" I.C. § 35-45-2-1(d)(1), (d)(3). "The text of the intimidation statute does not limit the phrase 'communicates a threat to another person' to only those threats made directly to or in the presence of the threatened party." *Ajabu v. State*, 677 N.E.2d 1035, 1042 (Ind. Ct. App. 1997), *trans. denied*. "The word 'communicate' encompasses those threats made known or transmitted to another person, and the statute does not limit the means utilized to convey the threat." *Id.* (explaining that "threats include those a person makes known to

the victim through the print, radio[,] or television media with the requisite intent"). *See also* I.C. § 35-45-2-1(c) (providing that a person's communication of a threat "includes posting a message electronically, including on a social networking web site"). Whether a particular communication constitutes a threat is an objective question for the trier of fact. *Owens v. State*, 659 N.E.2d 466, 474 (Ind. 1995), *reh'g denied.* Thus, whether Whitlock's communication to Alvarado, objectively viewed, was a threat was a question of fact for the jury to decide.

[15] Whitlock's argument regarding the threat element is nothing more than a request to reweigh the evidence. Here, the evidence showed that Alvarado arrived at Whitlock's house and found a "[c]haotic" scene. (Tr. Vol. 2 at 175). Whitlock was loudly playing the "Fuck the Police" songs and walking around the house. Whitlock was "[a]ngry" and "hostile," and she "cuss[ed] and "scream[ed]" at Alvarado and the officers. (Tr. Vol. 2 at 104). Eventually, Alvarado decided that she needed to file a "petition to keep the children in their home[,]" and she informed Whitlock and talked to her about placing the children with Grandmother. (Tr. Vol. 2 at 192). Whitlock "became upset[,]" refused placement with Grandmother, and said that "if they were going to be taking her[,]" then "she wanted [CPS] to place her children in foster care." (Tr. Vol. 2 at 177). Alvarado then started to step outside to call her supervisor, and Whitlock told the person on the phone that he "should come over and follow the CPS worker home and harm her" or "take care of her[.]" (Tr. Vol. 2 at 73, 177). Alvarado then walked outside, called her supervisor, and informed the

supervisor of what Whitlock had said. Given the context in which the statement was made, the jury could have reasonably concluded that Whitlock's statement was a threat to have a forcible felony committed against Alvarado. *See, e.g.*, *E.B. v. State*, 89 N.E.3d 1087, 1091 (Ind. Ct. App. 2017) ("It is well-established that a defendant need not speak directly with a victim to communicate a threat for purposes of Indiana Code section 35-45-2-1."). We will not reweigh the evidence or the trial court's determination. *See Drane*, 867 N.E.2d at 146.

[16] Additionally, we reject Whitlock's argument that there was not a clear nexus between Alvarado's prior lawful act and Whitlock's threat. This argument is a challenge to Whitlock's intent or whether Whitlock made the threat to Alvarado with the intent that she be placed in fear of retaliation for her prior lawful act of conducting a child welfare investigation. In regard to the intent element, "[t]here is nothing in the intimidation statute that requires a defendant to expressly state what the victim's prior lawful act was for which a defendant intends to retaliate." *Chastain v. State*, 58 N.E.3d 235, 240 (Ind. Ct. App. 2016), *trans. denied*. "It is well-settled that in criminal cases, the State is not required to prove intent by direct and positive evidence." *Id.* (internal quotation marks and citation omitted). "A defendant's intent may be proven by circumstantial evidence alone, and knowledge and intent may be inferred from the facts and circumstances of each case. *Id.*

[17] The evidence cited above is sufficient to show that Whitlock made the threat to Alvarado with the intent that she be placed in fear of retaliation for her prior

lawful act of conducting a child welfare investigation. Accordingly, we reject Whitlock's argument that there was not a clear nexus between Alvarado's prior lawful act and Whitlock's threat. Because there was probative evidence from which the jury could have found Whitlock guilty beyond a reasonable doubt of Level 6 felony intimidation against Alvarado, we affirm her conviction from Count 1. *See, e.g.*, *Fleming v. State*, 85 N.E.3d 626, 632 (Ind. Ct. App. 2017) (refusing to reweigh the jury's verdict and affirming the defendant's intimidation conviction where it was reasonable for the jury to infer from the evidence that the defendant's threat was prompted by the victim's prior lawful act); *Chastain*, 58 N.E.3d at 240 (affirming the defendant's intimidation conviction where the evidence showed that the victim had engaged in a lawful act and that the defendant then "directed his anger" toward the victim and "reacted in response" to the victim's act).

[18] Turning to Whitlock's challenge to her intimation conviction relating to Officer Archer, we note that in order to convict Whitlock of Level 6 felony intimidation as charged in Count 2, the State was required to prove beyond a reasonable doubt that Whitlock communicated a threat to the officers, "said threat being that she would have someone drive by and shoot the officer(s)," with the intent to place Officer Archer in fear of retaliation for his prior lawful act of "conducting an investigation and/or telling [Whitlock] to turn down her music[.]" (App. Vol. 2 at 23).

[19] Whitlock does not deny that she threatened Officer Archer nor does she dispute the fact that he engaged in a prior lawful act. Instead, she contends that her

"threat was completely unrelated to Officer Archer's actions" and that "she made nasty derogatory comments to everyone" that evening. (Whitlock's Br. 13). Thus, she challenges the intent element of the intimidation statute.

[20] Again, Whitlock's argument is nothing more than a request to reweigh the evidence. Here, the evidence showed that Officer Archer and the officers were dispatched to Grandmother's house when she became concerned about Whitlock's treatment of the children. As they talked to Whitlock in her bedroom, she told them that she "hate[d] the fucking police" and yelled for them to leave. (Tr. Vol. 2 at 68-69). Thereafter, when the officers were in the living room, Whitlock walked and yelled for the officers to get out. Officer Archer told Whitlock that he had called CPS and that the officers would not leave until they had spoken with CPS. Whitlock became "more enraged" and "scream[ed]" and "cuss[ed]" at the officers. (Tr. Vol. 2 at 126, 127). Whitlock then repeatedly played the "Fuck the Police" songs and walked around while talking on her phone. Whitlock told the person on the phone that "she was going to get her kids in the basement, [and] have her boys drive by and shoot [them] up; shoot the police up" and "shoot these fucking pigs." (Tr. Vol. 2 at 72, 102). As she said these words, she looked at the officers. Whitlock also took photographs of the officers and told them that "she was going to post them on Facebook so her people w[ould] know who [the officers] [we]re so they c[ould] kill [the officers]." (Tr. Vol. 2 at 104). From this evidence, the jury could have reasonably determined that Whitlock communicated a threat to Officer Archer with the intent to place him in fear of retaliation for his prior

lawful act of conducting an investigation. Accordingly, we affirm Whitlock's Level 6 felony intimidation conviction from Count 2.

[21] Affirmed.

Kirsch, J., and Bailey, J., concur.