## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 06 2020, 6:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Chad A. Montgomery
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Richard R. Shore,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 6, 2020

Court of Appeals Case No.
19A-CR-1463

Appeal from the
Warren Circuit Court

The Honorable
Hunter Reece, Judge

Trial Court Cause No.
86C01-1804-CM-68

**Altice, Judge.**

## Case Summary

Richard Shore was convicted following a bench trial of Class A misdemeanor intimidation. On appeal, he claims that the State failed to present sufficient evidence to convict him and that the State failed to prove that Warren County was the proper venue.

We affirm.

## Facts & Procedural History

On April 16, 2018, Shore made several calls to his bank, MainSource Bank, concerning a particular transaction. He was calling to complain because he had made a stop payment request, but due to the bank's processing procedures, the bank processed the transaction, which caused his account to fall into a negative balance resulting in an overdraft fee. Shore's phone calls were answered at MainSource's call center located in Greensburg, Indiana in Decatur County. One of Shore's calls was transferred to Dawn Ford, the Relationship Manager at the Williamsport, Indiana branch, in Warren County, which was Shore's "home bank" branch. *Transcript* at 13. Ford was familiar with Shore and recognized his voice from having previous interactions with him at the Williamsport branch over the course of a couple of years. Ford explained to Shore that the process of reversing the charges would occur overnight and that his money would be refunded and in his account the next day. Shore cussed and yelled at Ford, who hung up and then called her manager because she "was worried that [Shore] was going to come into the bank and be confrontational[.]"

*Id.* at 22. The manager was on vacation and out of the office that day, but Ford wanted to see if the manager would come into the branch, which he did.

[4] Shore called MainSource again, and call center representative Mike Lamar answered. Lamar told Shore that a $37 overdraft fee had been credited back to his account but that the account had a negative balance, explaining that the payment at issue had to proceed through nightly processing before the money would be added back into Shore's account. Noting to Lamar that he had paid a fee "to have it not go through," yet it did, Shore asked, "Why am I being f*cked for it . . . it wasn't my fault." *State's Ex.* 1. In reply, Lamar apologized for the inconvenience and reiterated that the check had to go through nightly processing before it could be added back to Shore's account. Shore, getting increasingly frustrated, asked Lamar, "How about if I just drive in to the bank then. Will they give me money if I drive in to the bank?" *Id.* Lamar responded, "Sir, unfortunately the account is at a negative balance." *Id.* Shore then said, "Well if I drive in there with a gun, they'll give me the money then, won't they?" *Id.* As Lamar was indicating that he was ending the call, Shore – now somewhat speaking over Lamar's words – said, "Cause I need it today. Well you'll be hearing about me then. I'm ready. F*ck you." *Id.* After ending the call, Lamer spoke with his supervisor and relayed that Shore had expressed going into the branch with a gun. The supervisor contacted the Williamsport branch, and the manager there called the police.

[5] Warren County Sheriff's Department Deputy Anthony Pruitt was dispatched to the Williamsport branch, listened to Shore's phone call with Lamar, and then

contacted Shore by phone by using a phone number that the bank had on file for Shore. Shore initially told Deputy Pruitt that he had the wrong number, but when Deputy Pruitt continued and explained that he was investigating a complaint of a threatening call to MainSource Bank, Shore replied that "I didn't threaten anyone." *Id.* at 24. Deputy Pruitt told Shore that he was trespassed from the bank and his accounts were being closed. The Williamsport branch closed for the remainder of the day and hired security officers to provide security for a week following Shore's phone call.

[6] On April 18, 2018, the State charged Shore with Class A misdemeanor intimidation. A bench trial occurred on June 6, 2019. Ford testified and explained that "[a] stop payment has to actually hit [a customer's] account before it can actually be stopped and sent back[,]" and, in Shore's case, the account balance fell to a negative figure when the check at issue "hit" the account. *Id.* at 19. Ford said that she told Shore that it would take the overnight process for the reversals to occur, and he was angry and said, "F*ck you, f*ck the bank" and repeated those words or the like multiple times. *Id.* at 21. Lamar testified that, when he was speaking to Shore, he knew from emails within MainSource that Shore already had called MainSource several times that day and that "[t]he minute I heard the word gun, I was done with the call and wanted to get off and speak with my supervisor." *Id.* at 9. The audio recording of Lamar's call with Shore was admitted into evidence. Ford testified that she was "alarmed and scared" when the call center contacted the

Williamsport branch with Shore's remarks about coming to the branch with a gun. *Id.* at 24.

[7]     Deputy Pruitt testified and confirmed on cross-examination that Shore's remarks to Lamar in the phone call, which Deputy Pruitt included in his probable cause affidavit, were in the form of a question, as opposed to a direct statement such as "I am going to drive in there with a gun[.]" *Id.* at 36. When Deputy Pruitt was asked, "Is it because Shore used the word gun that makes it a threat in your mind?", Deputy Pruitt replied, "Yeah, it is alarming when you hear the word gun at any point." *Id.* at 36.

[8]     In closing argument, the State urged:

> [Shore's] statements are statements that are designed to get the bank employees to change their policy. To make his money available to him that day. . . . [T]hey are aimed at trying to get access to those funds and he will go in there with a gun and he will get his money. . . . So Judge I think there is proof beyond a reasonable doubt here that [Shore] communicated what I believe are threats to come in there with a gun to get his money. Those were directed towards employees for the bank in Williamsport, Indiana and they were designed to get them to change their policy at least with respect to him that day to give him access to his money.

*Id.* at 38. In response, Shore's counsel argued that intimidation requires one to communicate a threat to someone with the intent that said person engages in conduct against his or her will and, here, the gun remark was not a statement that "I'm going to go and do this", which shows intent, but, rather, was a

question asking "What if I did it, what would happen if I did it?", which he maintained did not show any intent. *Id*. at 41. Moreover, counsel argued, even if it showed intent, the communication was with Lamar at the call center in Decatur County, not to the Williamsport branch in Warren County, and thus, he urged, the State had not shown that Warren County was the proper venue for the action.

[9] The trial court determined that the State had sufficiently established venue in Warren County and found Shore guilty of intimidation, imposing a sentence of 365 days, all of which the court suspended to six months of probation along with community service and an anger management course. Shore now appeals.

## Discussion & Decision

### a. Sufficiency of the Evidence

[10] Shore contends that the State did not present sufficient evidence to convict him of Class A misdemeanor intimidation. When reviewing sufficiency of the evidence claims, this court does not reweigh the evidence or assess the credibility of witnesses. *Fleming v. State*, 85 N.E.3d 626, 628 (Ind. Ct. App. 2017). We consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Id*. at 628-29. The conviction will be affirmed if there is substantial evidence of probative value to support the conclusion of the trier of fact. *Id*. at 629.

[11] To convict Shore of Class A misdemeanor intimidation, the State was required to prove beyond a reasonable doubt that Shore communicated a threat with the

intent that another person engage in conduct against the other person's will. *See* Ind. Code § 35-45-2-1(a)(1). Specifically, the charging information alleged that Shore "did communicate a threat to employees of MainSource Bank, with the intent that said persons engage in conduct against their will, to-wit: to refund money in a manner inconsistent with bank policy[.]" *Appellant's Appendix Vol. II* at 11. In relevant part, I.C. § 35-45-2-1(d) defines a threat as a means of expression, by words or action, of an intention to: (1) unlawfully injure the person threatened or another person, or damage property; (2) unlawfully subject a person to physical confinement or restraint; or (3) commit a crime. I.C. 35-45-2-1(d)(1)-(3). A defendant's intent may be proven by circumstantial evidence alone, and knowledge and intent may be inferred from the facts and circumstances of each case. *E.B. v. State*, 89 N.E.3d 1087, 1091 (Ind. Ct. App. 2017). Whether a statement is a threat is an objective question for the fact finder. *Newell v. State*, 7 N.E.3d 367, 369 (Ind. Ct. App. 2014), *trans. denied*. A defendant need not speak directly with a victim to communicate a threat for purposes of the intimidation statute. *E.B.*, 89 N.E.3d at 1092; *Ajabu v. State*, 677 N.E.2d 1035, 1043 (Ind. Ct. App. 1997), *trans. denied*. However, the statement must be transmitted in such a way that the defendant knows or has good reason to know the statement will reach the victim. *Ajabu*, 677 N.E.2d at 1043.

[12] Shore argues that what he conveyed to Lamar regarding the gun was not a threat because it was stated in the form of a "what if", and, thus, "Shore merely asked a question to the call center employee" and, further, "there was no evidence of an intent to injure." *Appellant's Brief* at 18. Shore suggests, "[T]here

is no evidence that the question about getting the money was anything more than a failed attempt to communicate through words." *Id.* We do not agree.

[13] Before calling and being transferred to Ford, Shore already had made several calls to MainSource expressing frustration about the situation with the processed check that resulted in a negative account balance. When Ford explained to him that the reversal of the charges would need to process overnight such that he would not get his money back until the next day, which he already knew from prior calls to the call center, Shore cussed and yelled at her because he wanted and needed his money sooner.

[14] Shore called MainSource again and this time spoke to Lamar, who apologized for the inconvenience but explained that the payment had to go through nightly processing. Shore became increasingly frustrated during his call with Lamar, first posing the query "how about if I just drive in to the bank then. Will they give me money?" *State's Ex.* 1. When Lamar replied that the account had a negative balance, and thus Shore could not access any money, Shore responded with "if I drive in there with a gun, they'll give me the money then, won't they?", which he immediately followed up with "cause I need it today. You'll be hearing about me then. I'm ready. F*ck you." *Id.* Taking the conversation in its totality, we find Shore's remark about the gun and the statements that followed, i.e., "you'll be hearing about me then" and "I'm ready", constituted a threat that was communicated with an intent to get his money that day, that is, to compel bank employees to refund money in a manner inconsistent with bank policy. Shore clearly was dissatisfied with the policy of making him wait

overnight, and we can empathize with his frustration, after all, he requested and paid for the bank to stop payment. Nevertheless, we find that considering the evidence most favorable to the judgment the trial court could reasonably infer that Shore communicated a threat with the intent that another person engage in conduct against the other person's will.

[15] Ford testified that Williamsport was Shore's "home branch" and that she was familiar with him, having seen and interacted with him in the bank during the last couple of years. *Transcript* at 13. There was no evidence presented that Shore banked at any other MainSource branch. Thus, the factfinder could reasonably infer that when Shore told Lamar, who was at the call center, that he could "drive in to the bank," to get his money in person, Shore meant driving to the Williamsport branch. Also, even though Shore did not make the gun remark directly to Ford, his statement was transmitted in such a way that Shore knew or had good reason to know that his statement would reach the Williamsport branch, especially in light of the fact that Shore's prior call had been transferred to Ford at the Williamsport branch. *See Ajabu*, 677 N.E.2d at 1043 (recognizing that communication can be indirect and affirming intimidation conviction because defendant used means of communication he knew or had good reason to know would reach the victims). In addition, we note any comment about bringing a gun to a bank, whether a hypothetical or otherwise, is going to raise a security concern, making it reasonable for Shore to anticipate that the call center was going to have to act on that and pass it along the proper channels. *See Newell*, 7 N.E.3d at 370 (finding that apartment

resident's angry statements, made to the complex's security guard, that the manager was about to get her "f*cking head knocked off" was a threat that "raised a security issue" and "a reasonable person could conclude that [the security guard] would have to report it to the manager). For all these reasons, we find that he State presented sufficient evidence to convict Shore of intimidation as charged.

## b. Venue

Shore contends that the State did not prove that proper venue existed in Warren County. The right to be tried in the county in which an offense was committed is a constitutional and a statutory right. *Baugh v. State*, 801 N.E.2d 629, 631 (Ind. 2004) (citing Ind. Const. Art. 1. §13, Ind. Code § 35-32-2-1(a)). The standard of review for a claim that the evidence was insufficient to prove venue is the same as for other claims of insufficient evidence. *Eberle v. State*, 942 N.E.2d 848, 855 (Ind. Ct. App. 2011), *trans. denied.* We neither weigh the evidence nor resolve questions of credibility, but look to the evidence and reasonable inferences therefrom which support the conclusion of requisite venue. *Neff v. State*, 915 N.E.2d 1026, 1032 (Ind. Ct. App. 2009), *trans. denied.*

Venue is not an element of the offense, and the State may establish venue by a preponderance of the evidence and need not prove it beyond a reasonable doubt. *Baugh,* 801 N.E.2d at 631. Venue is appropriate in a county if the defendant directs criminal activity into the county. *Id*. at 632.

[18] Shore argues that the phone call in which he made mention of a gun was made to the Greensburg call center, in Decatur County, and "[i]f it were to be considered as a threat, the threat was made in Greensburg, Indiana[.]" *Appellant's Brief* at 22. In support of his position, Shore refers us to *Neff*, in which this court reversed a Hamilton County child solicitation conviction, finding that the State failed to prove that proper venue existed in Hamilton County. While relevant, we find *Neff* distinguishable.

[19] There, twenty-year-old Neff, who resided in Anderson, Indiana, in Madison County, exchanged instant messages (IMs) with "Lizzy," who he thought was a twelve-year-old girl residing in Carmel, Indiana, in Hamilton County, but who was actually an adult woman living in Georgia, who volunteered with an organization that worked to catch adults preying on children in internet chat rooms. Neff made plans with Lizzy to meet at a Carmel Dairy Queen, telling her what car to look for, and the woman advised Carmel police of the planned meeting. Police observed the described vehicle with Madison County plates enter the Dairy Queen parking lot and pulled over Neff, who admitted that he drove there to meet a twelve-year-old girl he had been chatting with online. The trial court found Neff guilty.

[20] On appeal, Neff asserted, among other things, that the State failed to prove proper venue existed in Hamilton county since all of the computer chats occurred between him on his computer in Madison County and the woman in Georgia. This court agreed with Neff and reversed his conviction, finding that (1) the crime of child solicitation is completed at the time of the utterance and

"in the present case, Neff completed all the conduct that was required to establish the crime of child solicitation when he sat at his computer in Madison County", and (2) Neff did not send any IMs to any person actually existing in Hamilton County. *Neff*, 915 N.E.2d at 1034. The *Neff* court characterized it as "crucial and determinative" that Neff had not sent IMs to an actual person in Hamilton County. *Id.*

[21] *Neff* is clearly distinguishable from the present case. Shore, while speaking to Lamar, queried "how about *if I drive to the bank* then" to get "my money", and when he was met with the answer that it was not possible to give him money due to the negative balance, Shore then posed, "Well, *if I drive in there with a gun* they'll give me the money then, won't they?" *State's Exhibit* 1 (emphases added). These statements indicate that Shore was not referencing bringing a gun to the call center in Greensburg to get his money. Rather, he was suggesting that he could drive "to the bank" to get his money, and since Williamsport was his home branch and where he generally banked, the trial court could reasonably infer that Shore was directing his threatened actions into Warren County. We conclude the State presented sufficient evidence to establish that proper venue existed in Warren County.

[22] Judgment affirmed.


Robb, J. and Bradford, C.J., concur.